WILLIAM J. SCOWN, Appellant, *vs.* ANTHONY CZARNECKI *et al.* Appellees.

*Opinion filed June 16, 1914—Rehearing denied October 7, 1914.*

1. CONSTITUTIONAL LAW—*purpose of section 13 of article 4 of constitution.* The purpose of section 13 of article 4 of the constitution, requiring an amendatory act to insert the section amended, was to enable the meaning of enactments directly amending prior statutes to be ascertained by an examination of the enactments themselves, without the necessity of examining all prior statutes on the subject to ascertain the effect of the amendment.

2. SAME—*rule where act is complete in itself and does not purport to be amendatory.* An act which is complete within itself and does not purport, either in its title or in the body thereof, to amend or revive any other act, is valid, though it may by implication modify or repeal prior existing statutes.

3. SAME—*Woman's Suffrage act of 1913 does not violate section 13 of article 4 of the constitution.* The Woman's Suffrage act of 1913 (Laws of 1913, p. 333,) is not invalid as in violation of section 13 of article 4 of the constitution, upon the ground that it amends section 65 of the Election law without inserting that section at length in the act, as the Woman's Suffrage act is complete in itself, does not purport to amend any other act, is intelligible on its face, requires no further legislation to make it effective, and has for its only object the granting to women of the right of suffrage so far as offices and subjects mentioned in it are concerned.

4. SAME—*constitution is not a grant but a limitation of power.* The Illinois constitution is not a grant of power to the legislature but is a limitation on such power, and, except as to such restrictions as the constitution has imposed by express terms or by necessary implication, legislative power of the legislature is unlimited.

5. SAME—*if constitution has prescribed qualifications of electors the legislature cannot change them.* The right of suffrage is not a natural right but exists only by positive law, and if the constitution has prescribed the qualifications of electors such qualifications cannot be changed by the legislature.

6. SAME—*section 1 of article 7 of the constitution, concerning qualifications of electors, construed.* The qualifications of electors prescribed by section 1 of article 7 of the constitution apply to the elections provided for in that instrument but do not apply to other elections provided for only by statute, and which are therefore wholly within the control of the legislature.

264 — 20

7. SAME—*Woman's Suffrage act of 1913 does not violate section 1 of article 7 of the constitution.* The Woman's Suffrage act of 1913 (Laws of 1913, p. 333,) does not violate section 1 of article 7 of the constitution, as all of the offices mentioned in such act are within the control of the legislature, none of them being of constitutional origin, and it is competent for the legislature to declare the manner of filling them and by whom the incumbents shall be elected. (*People* v. *English,* 139 Ill. 622, and *Plummer* v. *Yost,* 144 id. 68, adhered to.)

8. SAME—*school directors, school trustees and boards of education are political officers.* School directors, school trustees and boards of education are political officers engaged in administering that portion of the government of the State committed to them, and there is no authority for classifying them as philanthropic or non-political officers, as the public school system was not established as a charity or from philanthropical motives but in the interest of good government, as a part of the government itself.

9. SAME—*legislature had no power to authorize women to vote at referendum elections provided for in constitution.* The provision of the Woman's Suffrage act of 1913 permitting women to vote on "all questions or propositions submitted to a vote of the electors of such municipalities or other political divisions of the State" covers every referendum election, including those provided for in the constitution, and in so far as it includes referendum elections provided for in the constitution the act is invalid, but its invalidity is confined to that matter alone, and the act is valid in so far as it applies to elections for offices or on propositions provided for by statute, alone.

10. STARE DECISIS—*Supreme Court should not overrule long established decision of constitutional question.* A deliberate decision of the Supreme Court upon the constitutional power of the legislature, which has stood unchallenged for many years and under which the highest political rights have been exercised without question, should not be overruled because the judges constituting the Supreme Court at a later period may hold views different from those held by the judges who constituted the court when the decision was made.

FARMER, COOKE and CRAIG, JJ., dissenting.

APPEAL from the Superior Court of Cook county; the Hon. CHARLES M. FOELL, Judge, presiding.

MAYER, MEYER, AUSTRIAN & PLATT, (LEVY MAYER, and ALFRED S. AUSTRIAN, of counsel,) for appellant.

CHARLES H. MITCHELL, (JOHN J. HERRICK, CHARLES
S. CUTTING, ISAIAH T. GREENACRE, and JOEL F. LONGE-
NECKER, of counsel,) for appellees.

McEWEN, WEISSENBACH, SHRIMSKI & MELOAN, (WIL-
LARD McEWEN, and ISRAEL SHRIMSKI, of counsel,) also
for appellees.

Mr. JUSTICE DUNN delivered the opinion of the court:

William J. Scown filed a bill in the superior court of
Cook county in behalf of all other tax-payers as well as
himself to restrain the election commissioners of the city of
Chicago and the town of Cicero from expending money for
providing separate ballots and ballot-boxes for women, and
for other purposes, in accordance with the provisions of
the act of the legislature of June 26, 1913, known as the
Woman's Suffrage act, (Laws of 1913, p. 333,) and the
act of June 30, 1913, amending the primary election laws.
A demurrer was sustained to the bill, which was dismissed
for want of equity, and the complainant appealed.

The ground on which the injunction was asked was that
the expenditures complained of were not authorized by law
because the Woman's Suffrage act is unconstitutional, and
that is the only question to be considered. The act provides
as follows:

"Section 1. *Be it enacted by the People of the State
of Illinois, represented in the General Assembly:* That all
women, citizens of the United States, above the age of
twenty-one years, having resided in the State one year, in
the county ninety days, and in the election district thirty
days next preceding any election therein, shall be allowed
to vote at such election for presidential electors, member
of the State Board of Equalization, clerk of the Appellate
Court, county collector, county surveyor, members of board
of assessors, members of board of review, sanitary district
trustees, and for all officers of cities, villages and towns,

(except police magistrates,) and upon all questions or propositions submitted to a vote of the electors of such municipalities or other political divisions of the State.

"Sec. 2. All such women may also vote for the following township officers: Supervisor, town clerk, assessor, collector and highway commissioner, and may also participate and vote in all annual and special town meetings in the township in which such election district shall be.

"Sec. 3. Separate ballot-boxes and ballots shall be provided for women, which ballots shall contain the names of the candidates for such offices which are to be voted for and the special questions submitted as aforesaid, and the ballots cast by women shall be canvassed with the other ballots cast for such officers and on such questions. At any such election where registration is required, women shall register in the same manner as male voters."

It is first contended that this act is in violation of section 13 of article 4 of the constitution, because it amends the general election laws but does not insert in the new act the section amended, reference being made particularly to section 65 of chapter 46 of the Revised Statutes, which is in the identical language of section 1 of article 7 of the constitution, as follows:

"Sec. 1. Every person having resided in this State one year, in the county ninety days, and in the election district thirty days next preceding any election therein, who was an elector in this State on the first day of April, in the year of our Lord 1848, or obtained a certificate of naturalization before any court of record in this State prior to the first day of January, in the year of our Lord 1870, or who shall be a male citizen of the United States, above the age of twenty-one years, shall be entitled to vote at such election."

It cannot be denied that the act in question changes the qualifications prescribed by said section 65 for voters for the offices mentioned in the act, and if it is to be regarded only as an amendment of that section, the constitutional re-

quirement has not been complied with and the act is void. Not every enactment, however, which enlarges, restricts or modifies previous statutes is subject to the constitutional objection made here. "Any new provision of law may in some sense be said to amend and change the prior system of laws, and whenever there is an irreconcilable conflict between two acts the later one must prevail. To the extent of the conflict the later act amends the earlier one by implication, and if the later act is not amendatory in form and perfect in itself it is not within the prohibition of the constitution. It is not necessary, when a new act is passed, that all prior acts modified by it by implication shall be re-enacted and published at length." (*Hollingsworth* v. *Chicago and Carterville Coal Co.* 243 Ill. 98.) The requirement of the constitution was intended to enable the meaning of enactments directly amending prior statutes to be ascertained by an examination of the enactments themselves, without the necessity of examining all prior statutes on the subject to ascertain the effect of the amendment. The purpose of this provision and its meaning have been announced in numerous cases, and in *People* v. *Crossley,* 261 Ill. 78, the whole question was again considered with reference to these cases, and the rule was reiterated that "an act which is complete within itself and does not purport, either in its title or in the body thereof, to amend or revive any other act, is valid though it may by implication modify or repeal prior existing statutes." This act does not purport to amend or revive any other act and it is complete in itself. Its only object is to extend to women the right of suffrage so far as the offices and subjects mentioned in it are concerned. The intention of the legislature can be ascertained without reference to any prior act. The act is entirely intelligible; its meaning appears clearly on its face; no further legislation is necessary; no machinery other than is provided is required to put it in operation and make it effective; nothing remains to be done other than

for the women to vote. The act does not violate section 13 of article 4 of the constitution.

It is argued that by section 1 of article 7 of the constitution, which has already been set out, the power of extending the right of suffrage to women has been denied to the legislature. This question is one of constitutional construction, purely. We cannot give expression to our own views as to the justice, the wisdom or the public policy of extending the right of suffrage to women or permit those views to affect the decision of this case. The right to determine who may vote rests with the legislature and not the courts, and the courts have no authority to interfere with the act of the legislature unless such act has been clearly prohibited by some provision of the constitution. It is elementary that the right of suffrage is not a natural right but exists only by positive law; that the constitution is not a grant of authority so far as the legislature is concerned but is a limitation of legislative power, and that the legislative power of the General Assembly is unlimited, except by such restrictions as the constitution has imposed in express terms or by necessary implication. It is also true that where the constitution has prescribed the qualifications of the electors they cannot be changed by the legislature. The question presented, therefore, is whether the qualifications of electors prescribed by section 1 of article 7 of the constitution apply to elections for the officers named in the act under consideration, and this question has been heretofore answered, practically and in principle, by the decisions of this court, in the negative. None of the offices named in the act in question are mentioned in the constitution but all have been created by statutory enactments. From the time of the organization of the territory of the United States north-west of the Ohio river under the ordinance of 1787, the right of suffrage under the various acts of Congress, constitutions and statutes from time to time in force in the territory now constituting the State of Illinois was confined to male inhabitants

or male citizens, and no woman was permitted or authorized to cast a vote for any office or upon any question until 1891. The General Assembly in that year enacted a law "to entitle women to vote at any election held for the purpose of choosing any officer under the general or special school laws of this State." Immediately the power of the legislature to extend to women the limited right of suffrage conferred by this act was questioned, the objection to the existence of such power being based upon the section of the constitution involved in the present case,—section 1 of article 7. The question was presented to this court in a petition for *mandamus* against the board of election commissioners of Cook county. (*People v. English*, 139 Ill. 622.) The precise question in that case was the right of a woman to vote at an election for county superintendent of schools. It was held that the legislature had no power to grant her such right, upon the ground that the county superintendent of schools was an officer provided for by the constitution, and that no person not possessing the qualifications prescribed in section 1 of article 7 could have the right to vote for a constitutional officer. The court expressly reserved the question whether it was competent for the legislature to provide that women might vote at an election of school officers not mentioned in the constitution, but the inference to be drawn from the opinion was that it was competent.

A year later this precise question was presented to the court in the case of *Plummer v. Yost*, 144 Ill. 68, in which case two men contested the election of two women as members of the board of education of a school district. The election turned upon the votes of women cast and counted for the women candidates, who would otherwise have been defeated. It was held that as to the two school officers mentioned in the constitution,—the State superintendent of public instruction and the county superintendent of public instruction,—the qualifications of electors must be those prescribed in section 1 of article 7 of the constitution,

but that the General Assembly had complete control as to what other school offices should be created and the manner in which the incumbents of those offices should be designated, and, if it provided for the choice of such officers by popular vote, it was not necessary that the voters should have the same qualifications as those of electors as defined by the constitution.

These two cases have established this construction of the constitution and they have been followed without question for many years. (*Ackerman* v. *Haenck,* 147 Ill. 514; *Dorsey* v. *Brigham,* 177 id. 250; *Collier* v. *Anlicker,* 189 id. 34; *Bloome* v. *Hograeff,* 193 id. 195.) The distinction which they indicate between offices of constitutional origin and those created by statutes as to their control by the legislature has been repeatedly recognized, and the rule has been often announced that an office created by legislative action is wholly within the control of the legislature. If an office is not of constitutional origin it is competent for the legislature to declare the manner of filling it, how, when and by whom the incumbent shall be elected or appointed, and to change, from time to time, the mode of election or appointment. *People* v. *Morgan,* 90 Ill. 558; *People* v. *Kipley,* 171 id. 44; *People* v. *Loeffler,* 175 id. 585; *People* v. *Olson,* 245 id. 288; *People* v. *Bowman,* 247 id. 276.

By these decisions the rule is settled that section 1 of article 7 of the constitution refers only to elections provided for by that instrument. The qualifications of voters at such elections are fixed by the constitution and the legislature cannot change them. Other elections, however, provided for only by statute and not by the constitution, are wholly within the control of the legislature. Against this statement of the law it is contended by counsel for the appellant, in the language of their brief, "that the words 'any election,' in section 1, refer to and embrace every election at which any political office is to be filled, whether the political office is created by the constitution itself or by

any law passed by the legislature under the powers con-
ferred upon it by that constitution." They then proceed to
argue that the case of *Plummer* v. *Yost, supra,* and the
cases which followed it, are not inconsistent with their ar-
gument because those cases involved only "district school
elections,—*i. e.,* non-political elections," and they lay down
the postulate that "school districts, boards of education and
similar instrumentalities for the control of the education
of the people of the State are of a philanthropic and non-
political character. They exercise no functions of a politi-
cal or governmental nature." This proposition is essential
to their argument, for if school directors and members of
boards of education hold political offices, then it has been
the uniform holding of this court for more than twenty
years that the words "any election," in section 1 of arti-
cle 7 of the constitution, do not embrace every election at
which any political office is to be filled and that the legis-
lature may confer on women the right to vote for politi-
cal offices.

Counsel give no definition of "political," and we know
of no division of the agencies of government into those
which are political and those which are philanthropic. The
terms have no relation to each other, and the division is
no more logical than would be a division of articles into
those which are red and those which are round. "Politi-
cal" is thus defined by Webster: "Of or pertaining to
polity or politics, or the conduct of government, referring
in the widest application to the judicial, executive and leg-
islative branches; of or pertaining to or incidental to the
exercise of the functions vested in those charged with the
conduct of government; relating to the management of af-
fairs of state." Politics is "the science and art of govern-
ment; the science dealing with the organization, regulation
and administration of a State in both its internal and ex-
ternal affairs." The public school system of the State was
not established and has not been maintained as a charity or

from philanthropic motives. The first legislative expression in regard to schools in Illinois was in the ordinance of 1787, which declares that "religion, morality and knowledge being necessary to good government and the happiness of mankind, schools and the means of education shall forever be encouraged." This declaration grew, not out of philanthropic motives, but out of a consideration of the essentials of good government. The conduct and maintenance of schools by school directors, school trustees and boards of education is no less an "exercise of the functions vested in those charged with the conduct of government," is no less a part of "the science and art of government," and deals no less with "the organization, regulation and administration of a State" in its internal affairs, than the construction and maintenance of roads by the commissioners of highways; the conduct and maintenance of the charitable institutions of the State by the board of administration; the inspection of factories, and the enforcement of the laws for the protection of workmen and in regard to the employment of women and children, by the factory inspectors; the performance by the industrial board of the duties imposed upon it by law, and the performance of many other duties by public officials which, however beneficial to individuals, are not undertaken from philanthropic or charitable motives, but for the protection, safety and welfare of the citizens of the State in the interest of good government. School districts are involuntary political divisions of the State, each embracing a certain territory and all the inhabitants thereof, organized for the public advantage and not in the interest of individuals, having for their purpose the exercise within their territory, by their inhabitants and for their benefit, of that part of the governmental function committed to them. There is no higher exercise of the sovereign power than the exaction from the citizen of a part of his property as taxes, in payment of his proportionate share of the expenses of government.

When school directors levy taxes they exercise political power of the highest quality. When they purchase school sites, build and equip school houses, employ teachers, and disburse, in their discretion, public funds for these purposes, their action is political,—it pertains to the conduct of government. It differs in no respect, so far as this quality is concerned, from the acts of highway commissioners with reference to their duties in connection with roads. Neither school directors nor highway commissioners have legislative or judicial powers, but both are administrative officers, engaged in administering that portion of the government of the State committed to them by law. Neither of them exercises any function which is not of a political and governmental character.

This same argument was advanced in the case of *People v. English, supra,* in which counsel for the petitioner made the claim that the constitutional clause that voters shall be males does not refer to school elections but only to political offices; that school districts are *quasi* corporations of a charitable nature and exert no functions of government; that the constitution refers only to political offices, and that the article on education (article 8) should be construed by itself. The court did not take this view of the matter, but said (p. 630) : "It is suggested that article 8 of the constitution, entitled 'Education,' makes it the duty of the General Assembly to provide 'a system of free schools,' and that therefore the various sections in said article 8 should be construed by themselves and without reference to other provisions contained in the constitution. The conclusion reached does not seem to follow from the premises stated. The General Assembly, in accordance with the mandate of the constitution, passed an act in 1872 'to establish and maintain a system of free schools.' (Rev. Stat. 1874, p. 947.) The State superintendent of public instruction and the county superintendents of schools were made component and important parts of the system established by the

act, and their duties were therein defined and provisions therein made for their election. But notwithstanding this, the requirements of sections 3 and 20 of article 5 of the constitution, in regard to the election of a State superintendent of public instruction, still remained in full force, as also did the provision of the constitution which fixed the qualifications of those who could vote at an election for such State superintendent, or for any other officer provided for in the constitution."

In distinguishing the case of *Belles* v. *Burr,* 76 Mich. 1, (which counsel for the appellant rely upon here,) and the cases of *Wheeler* v. *Brady,* 15 Kan. 26, and *State* v. *Cones,* 15 Neb. 444, in which the right of women to vote for district school officers had been sustained, it was further said in the *English case* (p. 631): "We do not consider said cases as here in point or that the decisions which were rendered in them are in conflict with the conclusion which we have reached in the present controversy. In the Michigan case the question at issue was in regard to the right of the plaintiff, a woman, to vote, under a statute of that State, at an election for school trustees of a school district, and the court, speaking of the constitution of the State, said: 'But no officer of the school district is mentioned or recognized by that instrument. The reason is, that the whole primary school system was confided to the legislature, and it cannot be said that the officers of school districts, chosen pursuant to the system adopted by the legislature, are constitutional officers. * * * While it must be conceded that no person can vote for the election of any officer mentioned in the constitution unless he possesses the qualifications of an elector prescribed by that instrument, it does not follow that none but such electors can vote for officers which the legislature has the right to provide for, to carry out the educational purpose declared in that instrument.' This is a plain intimation that if the constitution of Michigan had provided for or mentioned school trustees of school

districts, then the decision in that case would have been otherwise."

This plainly indicates that the decision of the court was based upon the ground that the county superintendent of schools is a constitutional officer, and further indicates the view of the court that the decisions cited were based upon the power of the legislature to provide for the election of officers not mentioned in the constitution by persons having different qualifications from those prescribed by the constitution, and that the right of women to vote for school directors and other school officers not mentioned in the constitution could be sustained only by virtue of such power and not by a construction of article 8 of the constitution, independently of the other provisions of that instrument. Whether such right could be sustained at all was not then decided, but in *Plummer* v. *Yost, supra,* the right was sustained, the court citing the case of *Belles* v. *Burr, supra,* and again quoting the last sentence of the quotation from the opinion in that case given in *People* v. *English, supra.* This court said (p. 73): "Section 1 of article 8 of the constitution makes it the duty of the General Assembly to 'provide for a thorough and efficient system of free schools, where all the children of this State may receive a good common school education.' The mode in which the required 'system of free schools' should be organized, and the officers by whom it should be controlled and directed and its affairs administered, is left to the legislative discretion of the General Assembly. The only school officers expressly provided for by the constitution are a county superintendent of schools in each county and a State superintendent of public instruction. * * * At the election of these two officers, as we held in the case above cited, the qualifications of the electors must be those prescribed in section 1 of article 7 of the constitution. But the constitution contains no direction as to what other school offices shall be created or as to the mode in which the incumbents of those offices shall

be designated and chosen. Those matters are left wholly to the discretion of the General Assembly."

Counsel for the appellant, in referring to this case, say that it is only upon the theory that school trustees and members of the board of education are not political officers and that they do not exercise political functions and that the school system is governed by a separate and independent article of the constitution that the doctrine of *Plummer* v. *Yost* can be upheld. On the contrary, all that was said in that case is just as applicable to the offices of highway commissioners, or to any other township or municipal offices, or to any other offices which the General Assembly has the authority to create, as to school offices. The theory that an educational article in the constitution imposing upon the legislature the duty of establishing a school system authorized the legislature, in selecting officers for the system it might establish, to disregard the constitutional provisions in regard to the qualification of electors, had its origin in the Michigan case. (*Belles* v. *Burr, supra.*) Reference was made in that case to the fact that for fifty years before the question arose there, the qualifications of voters at school district meetings, as fixed by statute, had been different from those prescribed by the constitution for electors entitled to vote under that instrument. The first constitution of the State of Michigan provided that the legislature should establish a school system, and under this constitution, from the beginning, the legislature in fact fixed the qualifications of voters at school district meetings without regard to the qualifications prescribed by the constitution for electors at other elections. School districts had preceded the constitution and were recognized by it, but no officer of the school district was recognized or mentioned in the constitution. It was held that the whole primary school system was committed to the legislature, and the court used the language that "the authority granted by the constitution to the legislature to establish a common or primary school

system carried with it the authority to prescribe what officers should be chosen to conduct the affairs of the school district, to define their powers and duties, their term of office and how and by whom they should be chosen."

Counsel do not claim, and probably no one will assert, that the constitution granted to the legislature authority to establish a school system. Constitutions may limit the power of the legislature but they are not the source of legislative power. In fact, the Supreme Court of Michigan took into consideration the contemporaneous construction of the constitution by the legislature as exemplified by its acts, and because of such contemporaneous construction held that the legislature should be regarded as having the power, which it had always exercised, to prescribe by whom officers to conduct the affairs of school districts should be chosen, without regard to the requirements of the constitution as to the qualifications of electors. In New York, where the constitution prescribed the qualifications of voters "for all offices that now are or hereafter may be elective by the people" and limited the franchise to "male citizens," a woman claimed the right to vote for school commissioner, contending that this office was taken out of the constitutional provision by the long and invariable interpretation placed upon it. The court held that this was the only possible answer to the claim that she was disqualified under the constitution, but that such interpretation had been applied only to the officers of the school district and that she was not qualified to vote for school commissioner, whose duties extended to superintendence over many districts. In *Harris* v. *Burr*, 32 Ore. 348, the court relied upon a contemporaneous and uniform legislative interpretation of the constitution, similar to that in Michigan, as authorizing the legislature, in establishing a system of common schools, to determine what officers should administer its affairs, who and what manner of persons should be eligible to office and how and by whom they should be chosen. In New Jer-

sey the constitutional provision in regard to suffrage was: "Every male citizen of the United States * * * shall be entitled to vote for all offices that now are or hereafter may be elective by the people." In *State* v. *Hendee,* 57 N. J. L. 307, it is said: "In *State* v. *Deshler,* 25 N. J. L. 177, it was adjudged that trustees of school districts were officers within this constitutional provision. But it is said that this adjudication has ceased to be authoritative, because, since it was rendered, an amendment of the constitution has imposed on the legislature the express duty of providing for the maintenance and support of a thorough and efficient system of public schools. I am quite unable to see how the imposition of this duty affects the question whether school trustees are officers, or whether, if they are made elective by the people, any other than constitutional voters may vote for them. The duty of the legislature must be performed in accordance with all other constitutional provisions."

Under the doctrine of contemporaneous, long continued and uniform legislative construction the Supreme Courts of New York, Michigan and Oregon have recognized the right of the legislature to fix different qualifications for voters for district school officers from those prescribed by the constitution for electors in other cases. That doctrine has no application in Illinois. Before the constitution of 1870 there was no constitutional provision in regard to schools. No express duty and no limitation were imposed upon the legislature in that regard. In 1825 an act was passed providing for the establishment of free schools. Such officers as the legislature saw fit to provide for the conduct of the schools it required to be elected by the legal voters. From time to time the law was amended. The Secretary of State was made State superintendent of public instruction. Afterward a State superintendent of public instruction was elected. A commissioner was elected in each county, who had supervision of the schools in his county, and later a county superintendent of public instruction was elected.

All of this legislation occurred many years before 1870, and when the constitution of 1870 was adopted the system of free schools throughout the State was already established and had been in operation for years, and the mandate of that instrument to the General Assembly to provide a thorough and efficient system of free schools merely imposed upon that body the duty to continue the work it had already begun and to carry it to a higher degree of efficiency. The constitution adopted the State superintendent of public instruction and the county superintendent of public instruction, imposed some limitations not relating to the question in hand, and left the General Assembly with the same free hand which it had always used. For twenty years longer there were no great changes in the School law, and then the legislature decided that women should have the right to vote for school officers and passed the law of 1891. Until that time the law provided that only legal voters should vote for school officers. The system of free schools had been established by the General Assembly. The constitution had granted the legislature no power, and the legislature had assumed none, as to which any question had been or could be raised until the enactment of that law. When the question came before the court reference was made to the educational article of the constitution,—not as relieving the legislature from any of the limitations imposed by any other of the provisions of that instrument, but as showing that no restrictions were imposed upon the legislature as to the designation of officers under that article except the State superintendent of public instruction and the county superintendent of public instruction. There was no question of contemporaneous construction to help the court or to confuse the question and no question of any grant of power by the legislature. No such question was mentioned or considered, but the two cases were decided on the broad ground that the legislature has the power to prescribe qualifications for voters where the officers to be elected are not

264 — 21

provided for in the constitution. That principle is decisive of the question now under consideration.

Since our own decisions in numerous cases during many years have established the principle involved under our constitution, it will be neither necessary nor profitable to investigate the decisions of other States under their constitutions. While there may be some conflict in such decisions their weight is not contrary to the long established doctrine of this court, and if it were otherwise we would not, out of deference to such decisions, change the construction which we have placed upon a provision of the constitution of the State. The case of *Plummer* v. *Yost* has been cited in other jurisdictions as sustaining the proposition of the cases of *Belles* v. *Burr, supra,* and *Harris* v. *Burr, supra,* that the constitutional injunction upon the legislature to establish a system of free schools is to be construed independently of the rest of the constitution, and of itself confers upon the legislature power to adopt such system and provide for the election of such officers as it chooses, unrestrained by all other provisions of the constitution. We have seen that that was not the view adopted and that in the case of *People* v. *English* it was expressly repudiated. In *State* v. *Dillon,* 32 Fla. 545, in *Buckner* v. *Gorden,* 81 Ky. 665, and in *Hanna* v. *Young,* 84 Md. 179, it was held that constitutional provisions prescribing the qualifications of electors do not apply to any election for municipal offices not provided for by the constitution but created by legislative enactment. This is the doctrine announced in the case of *Plummer* v. *Yost,* and the case was cited in support of the doctrine in *State* v. *Dillon, supra.*

The act in question provides that women may vote not only for the officers named, but also "upon all questions or propositions submitted to a vote of the electors of such municipalities or other political divisions of this State." The constitution provides, in different sections, for a referendum upon various questions and propositions to be determined

by the people, the voters, or the legal voters of the State, the county or of the city of Chicago. It is contended by the appellant that only electors possessing the qualifications prescribed in the constitution can participate in such a ref-erendum; that the legislature has not the power to give to women the right to do so; that therefore the attempt to give them the right to vote upon all questions or propositions submitted to a vote of the electors is unconstitutional, and that the words of the act are not separable, so that it can be sustained to the extent that it was authorized by the constitution. The appellees insist that the section does not attempt to confer the right of suffrage upon women in the matter of all questions or propositions submitted to the electors of a county, but we do not agree with this contention. The words "such municipalities" refer to those named, and the words "other political divisions of this State" include counties. It must be conceded that no new bonded indebtedness other than for refunding purposes can be incurred by the city of Chicago without the consent of the majority of the legal voters in the city, and that no county can be divided or have any of its territory taken from it except by a vote of a majority of the legal voters of the county. There are other cases mentioned in the constitution where the consent of a majority of voters is required, and in attempting to give to women the right to vote upon all questions or propositions submitted to the vote of electors in the municipalities or political subdivisions of the State the legislature exceeded its powers. There are many questions and propositions, however, not mentioned in the constitution, which may be submitted by the legislature to a referendum at which women may be authorized to vote. Does the fact that the legislature has acted in excess of its power in some particulars and enacted a law which cannot have effect in some cases render the whole act void and invalidate the grant of the right of suffrage even in those cases where the legislature has the undoubted

power to grant it? It is a well settled rule that a statute may be in part constitutional and in part unconstitutional, and that in such cases the constitutional part of the act will be given effect and the unconstitutional part disregarded, unless the unconstitutional part is of such a character that it may be inferred that without it the legislature would not have passed the act. The most usual form in which the question is presented is where the constitutional and unconstitutional parts of the enactment are contained in separate sections, as in *People* v. *Olsen,* 222 Ill. 117. In that case the opinion, after quoting at length from Cooley on Constitutional Limitations, states (p. 134) that "in the language of the rule laid down by Judge Cooley, *supra,* the fact that one part of a statute is unconstitutional does not authorize the courts to declare the remainder void also, unless all the provisions are connected in subject matter, depending on each other, operating together for the same purpose, or otherwise so connected together in meaning that it cannot be presumed the legislature would have passed the one without the other." The constitutional and unconstitutional provisions are sometimes contained in the same section, as in *City of Chicago* v. *Wolf,* 221 Ill. 130, where it was claimed that the act was void as to the State treasurer and county treasurer for constitutional reasons, and was therefore void as to the other officers mentioned in the act. After again quoting from Cooley the court said (p. 141) : "When we attempt to apply this rule to the statute now before us, it becomes evident that the provisions, so far as they affect the State treasurer and county treasurers, are in nowise connected with or dependent upon the other provisions, so far as those other provisions affect other custodians of public funds,—that is, it is not apparent that the legislature would not have passed this act with reference to all custodians of public funds other than the State treasurer and the county treasurers, had it appeared to that body that for constitutional reasons such an act could not be made effect-

ive as to the last named officers." In these two cases the language was severable. In the first the unconstitutional section, and in the second the names of the officers as to whom the act was unconstitutional, could be stricken from the act and a valid constitutional act remain, and it is to such cases, only, as the appellant insists, that the rule in regard to the separableness of constitutional from unconstitutional provisions in an enactment applies. There are many cases which hold that where a statute accomplishing all its results by the same general words in a single section has covered subjects as to which the legislature could, and subjects as to which it could not, constitutionally enact laws, it cannot be restricted lawfully, by construction, to the constitutional class, because the part applicable to that class is not separable from the part applicable to the unconstitutional class, so that each may be read and may stand by itself. Thus the constitutionality of the act is made to depend upon the form of the enactment. For instance, in *City of Chicago* v. *Wolf, supra,* the act referred to "the State treasurer, and every county, city, township, school and park treasurer and every other custodian of public funds," and because the words "the State treasurer and" and "county" could be stricken out of the act the remainder could be held constitutional, but if the act had referred only to "every custodian of public funds" nothing could have been stricken out, the constitutional part of the act could not have been given effect, and not being wholly valid it would have been altogether void.

There are other cases, however, which hold that a law will not be held void because the legislature has attempted more than it had the constitutional power to make effectual, and that courts, treating the question as one of legislative power and not of verbal form, will separate statutes valid in part and in part void because in excess of the legislative power, and will disregard the excessive exercise of power and preserve so much as is within the legislative power.

In *Commonwealth* v. *Gagne,* 153 Mass. 205, it is said: "Where a statute is in some respects or in relation to some subjects unconstitutional but in other respects is not, the whole statute is not to be declared void unless the parts are so connected and so interdependent that they cannot be separated, or those which are unconstitutional are of such a character that it must be inferred that but for them and their assumed validity the legislation would not have been had. * * * A law which is unconstitutional within certain limitations, if in terms it exceeds or fails to notice those limitations may yet be entirely operative within its legitimate sphere and properly held to have the application which thus confines it." In this case the court held that a statute which prohibited the sale of intoxicating liquors except as authorized by the act was not rendered unconstitutional by a failure to exempt from its operation liquors imported and sold in original packages.

In *Commonwealth* v. *Kimball,* 24 Pick. 359, a statute prohibiting the sale of intoxicating liquor without a license made no exception in favor of imported liquor. Chief Justice Shaw, in delivering the opinion, said: "But it is argued for the defendant that the prohibition to sell is general and makes no distinction between the cases of a sale by the importer of imported spirits in the original packages, supposing them under twenty-eight gallons, and the sale of spirits not imported, or not by the importer or not in the original packages. Be it so; what is the consequence? Suppose the law could be construed to be repugnant to the constitution of the United States in so far as it prohibited the sale of imported spirits by the importer in the original package, it would be void thus far and no farther, and in all other respects conforming to the acknowledged power of the State government it would be in full force. Whether legal enactments, some of which it is competent for the legislature to make and others not, are contained in the same or in different sections of the statute can make no

difference. It is not the defect of form, but of power, that invalidates any of them. It is therefore the subject matter, and not the arrangement of the language in which it is embodied, that is to be regarded in deciding whether any provision is constitutional or not."

In *State* v. *Amery,* 12 R. I. 64, a similar statute prohibiting the sale of intoxicating liquors contained no exception of those imported and sold in original packages. It was said: "It is perfectly well settled that a statute which is unconstitutional or void in part may still be valid as to the residue, unless the parts are so intimately connected that it cannot be supposed that one part was intended to be enforced independently of the other." After the citation of some cases it is said: "These cases are not distinguishable, in point of principle, from the case at bar. The doctrine of them is, that if a law which is constitutional under certain limitations exceeds those limitations, it may still be operative within its legitimate sphere and void only for the excess."

In *Chamberlain* v. *Cranbury,* 57 N. J. L. 605, and *Landis* v. *School District No. 44,* 57 id. 509, the statute gave women the right to vote at any school meeting, and it was held unconstitutional as to voting for officers but constitutional and enforceable as to voting for all other purposes at school meetings. In *Hagerstown* v. *Dechert,* 32 Md. 369, the legislature enacted that the mayor should have all the jurisdiction and powers of a justice of the peace. It was held that the legislature had no power to appoint a justice of the peace or vest judicial power in the mayor, and to that extent the act was unconstitutional and inoperative but that it was constitutional and valid to the extent that it conferred upon the mayor the police powers, as a conservator of the peace, of a justice of the peace. In *Sinking Fund Comrs.* v. *George,* 104 Ky. 260, the legislature was not authorized, under the constitution, to fix the terms of officers exceeding four years but it passed an act fixing a term of

six years for certain commissioners, and it was held void
for a six-year term but good for four. So, also, there are
similar decisions in *Murphy* v. *Wheatly,* 100 Md. 358, *El-well* v. *Adder Machine Co.* 136 Wis. 82, *Income Tax cases,*
148 id. 456, *Allen* v. *Texas Pacific Railway Co.* 100 Tex.
525, *Standard Oil Co.* v. *State,* 117 Tenn. 618, *Oliver* v.
*Chicago, Rock Island and Pacific Railway Co.* 89 Ark. 466,
*Deppe* v. *Chicago, Rock Island and Pacific Railway Co.* 36
Iowa, 52, *Pittsburg, Cincinnati, Chicago and St. Louis Rail-road Co.* v. *Montgomery,* 152 Ind. 1, *Chicago, Kansas and
Western Railroad Co.* v. *Pontius,* 157 U. S. 209, and *Attor-ney General* v. *Electric Storage Battery Co.* 188 Mass. 239.

This question, as well as all other questions now raised
in opposition to the decree of the court below, was involved
in the two cases of *People* v. *English* and *Plummer* v. *Yost,*
*supra,* and the decisions rendered in those cases that the
act then under consideration was unconstitutional as to the
State and county superintendents but constitutional as to
the school officers not mentioned in the constitution is in-
consistent with all of the appellant's contentions. The act
of 1891 amended section 65 of chapter 46 of the Revised
Statutes in the same manner as the act now under consid-
eration. It extended the right to vote for public officers to
women as does the act now under consideration, though not
to the same extent, and it attempted more than the legisla-
ture had the constitutional power to make effectual, by in-
cluding in the same general words, in a single section, sub-
jects as to which the legislature could and subjects as to
which it could not constitutionally enact laws, as does the
act now under consideration. The same objections existed
against that act as are urged against this, and the court
sustained it as a constitutional exercise of the legislative
power. We cannot sustain the objections urged against the
present act without expressly overruling those decisions as
well as the numerous cases which have since followed them.
Those decisions established the construction of the funda-

mental law of the State many years ago, and the stability
of this fundamental law requires that when the meaning
of a constitutional provision has been considered by the
court and declared by its decisions, that meaning cannot be
afterward considered open to question or further argument.
"It is the duty of this branch of the government to pass
finally upon the construction of a law and determine whether
the legislature in its action has transcended its constitutional
limits, and the community has the right to expect with con-
fidence we will adhere to decisions made after full argument
and upon due consideration. The members of the court
may change totally every six years, and if each change in
the organization produces a change in the decisions and a
different construction of laws under which important rights
and interests have become vested, it is easy to see that the
consequences will be most pernicious." (*Fisher* v. *Horicon
Iron Co.* 10 Wis. 351.) The most indispensable guaranty
of civil liberty, according to Mr. Hallam, (1 Const. Hist.
230,) is the "open administration of justice according to
known laws." The law can be known only if fixed rules
once established are consistently adhered to. Decisions of
the courts are the highest evidence of what the law is.
"Respect for precedents, alone, can secure the stability and
uniformity of the law. Without such respect it would be a
shifting quicksand." If ever there should be an adherence
to former decisions it should be in cases of construction of
the constitution involving the rights of citizens as declared
by that instrument. There is no higher privilege of citi-
zenship in the State than that of suffrage. For more than
twenty years that privilege has been enjoyed by women and
the courts have recognized and declared their constitutional
right to it. Women have been elected trustees of the State
university, school directors and members of boards of edu-
cation in innumerable instances. By their votes elections
have been decided, important offices have been filled and im-
portant public business controlled. Ought they to be sum-

marily deprived of their constitutional rights because of a change in the personnel of the court, because the judges who decided *People* v. *English* and *Plummer* v. *Yost* are all dead except one, even if the successors who sit in their seats should hold different views? The constitution does not change with the judges. The court is the same though the judges change, and it will not overturn a deliberate decision upon the constitutional power of the legislature under which the highest political rights have been held and exercised without question for many years. The object of the General Assembly in passing the present act was to confer upon women the right of suffrage to the fullest extent permitted by the limitations of the constitution. No one would imagine that the act would not have been passed if the General Assembly had known that the right of voting on the few, and for the most part comparatively infrequent and unimportant, questions mentioned in the constitution could not be extended to women. For all other purposes the act is a constitutional and valid enactment.

The decree of the superior court will be affirmed.

*Decree affirmed.*

Mr. JUSTICE FARMER, dissenting:

It is my view that while the legislature has the power to create and provide for the election of officers not named in the constitution it has no power to provide qualifications for voters at the election of such officers different from the qualifications prescribed by the constitution. The qualifications of electors fixed by the constitution apply, as I believe, to voters, as that instrument says, at "any election," and the constitution is not subject to the construction that these qualifications apply only to voters at elections for offices created by the constitution. In my opinion, when the constitutional convention acted and prescribed the qualifications of voters at "any election," the legislature was left no power to provide different qualifications for voters at

elections for officers to offices created by it.  I can under-
stand the constitution in no other sense than that it was the
intention that the right to vote at "any election," which is
the equivalent of "all elections," should be limited to those
possessing the qualifications defined in section 1 of article 7.
Many of the offices created by statute are as important po-
litical offices as those named in the constitution, and there
seems to me no intimation in the language of the suffrage
article that it was to be restricted in its application to elec-
tions for offices provided for in the constitution.  I concede
my views are not in harmony with *Plummer* v. *Yost.*  That
case, I think, supports the opinion of the court in this case,
and if my view prevailed it would necessarily overrule that
decision.  For that reason I have felt reluctant to express
my dissent, but no rule of property being involved in this
decision I do not believe it a case for the application of
the doctrine of *stare decisis.*  This court in 1832, in *Bowers*
v. *Green,* 1 Scam. 42, and repeatedly since that time, has,
when convinced a previous decision involving no rule of
property was erroneous, refused to adhere to it.  This and
other State courts of last resort, as well as the Supreme
Court of the United States, have refused to be bound by
former decisions involving a construction of the constitu-
tion or of statutes.  (*Allardt* v. *People,* 197 Ill. 501; *Bur-
dick* v. *People,* 149 id. 600; *People* v. *McGowan,* 77 id.
644; *State* v. *Lewis,* 69 Ohio St. 202; *Willis* v. *Owen,*
43 Texas, 41; *Robinson* v. *Shank,* 102 Ind. 307; *People*
v. *Curtice,* 50 Colo. 503; *Beck* v. *Allen,* 58 Miss. 153; *Pol-
lack* v. *Farmers' Loan and Trust Co.* 157 U. S. 429; *Gar-
land* v. *Washington,* 232 id. 642.)  In *Propeller Genesee
Chief* v. *Fitzhugh,* 12 How. 443, the Supreme Court of the
United States overruled its former decision in *Steamboat
Thomas Jefferson case,* 10 Wheat. 428.  In the opinion by
Chief Justice Taney it was said: "It is the decision in the
case of *The Thomas Jefferson* which mainly embarrasses
the court in the present inquiry.  We are sensible of the

great weight to which it is entitled, but at the same time
we are convinced that if we follow it we follow an erroneous decision into which the court fell when the great importance of the question as it now presents itself could not
be foreseen, and the subject did not, therefore, receive that
deliberate consideration which at this time would have been
given to it by the eminent men who presided here when
that case was decided, for the decision was made in 1825,
when the commerce on the rivers of the west and on the
lakes was in its infancy and of little importance and but
little regarded compared with that of the present day." In
the *Legal Tender cases,* 12 Wall. 457, the Supreme Court
overruled *Hepburn* v. *Griswold,* 8 Wall. 603, and in doing
so said: "The questions involved are constitutional questions of the most vital importance to the government and
to the public at large. We have been in the habit of treating cases involving a consideration of constitutional power
differently from those which concern merely private right,
\* \* \* and it is no unprecedented thing in courts of
last resort, both in this country and in England, to overrule decisions previously made. We agree this should not
be done inconsiderately, but in a case of such far-reaching
consequences as the present, thoroughly convinced, as we
are, that Congress has not transgressed its powers, we regard it as our duty so to decide and to affirm both these
judgments." In *Pollack* v. *Farmers' Loan and Trust Co.
supra,* the court said: "Manifestly, as this court is granted
with the power and entrusted with the duty to maintain
the fundamental law of the constitution, the discharge of
that duty requires it not to extend any decision upon a constitutional question if it is convinced that error in principle
might supervene." The same rule has been acted upon by
State courts in the cases above cited and many others that
might be referred to. Certainly the decision in *Plummer* v.
*Yost* should be followed if it is correct, but if it is erroneous, as I believe it to be, it should not be adhered to under

the rule of *stare decisis*. If the constitutional qualification that only male citizens may vote can be disregarded in the election of officers to offices created by statute, then as to the election of such officers the legislature may also prescribe different qualifications as to age, residence, etc. It is my belief that it was not within the contemplation of the framers of our constitution that the legislature should have the power to prescribe the qualifications of voters, but that until the constitution is amended voters at all elections, whether for constitutional or statutory offices, must possess the qualifications prescribed by section 1 of article 7.

Mr. JUSTICE COOKE, dissenting:

I cannot concur in the views expressed in the majority opinion or the conclusion reached therein. The questions involved are of such importance that I deem it my duty to state somewhat extensively the basis of my dissent.

Appellant has advanced three reasons in support of his claim that the act under consideration is unconstitutional: (1) That it is in conflict with section 1 of article 7 of the constitution; (2) that as the constitution itself provides for the submission of certain propositions to a vote of the electors, the legislature in no event has the power to give women the right to vote on all questions or propositions; and (3) that the act violates section 13 of article 4 of the constitution, in that it amends section 65 of the Election act without inserting that section at length in the new act. I deem it necessary to discuss only the first of the reasons urged. If the act is unconstitutional, as I believe it is because of the first reason assigned, the second reason urged becomes of no importance, for the reason that it is wholly improbable that the legislature would have enacted that part of the statute, alone. It is so fragmentary and incomplete when severed from the other portions of the act that it could not be held to be an independent piece of legislation. As to the third reason urged, I concur with the conclusion

of the majority that the act does not violate section 13 of article 4 of the constitution.

The contention of the parties as made under the first reason urged may be briefly summed up thus: By appellant, that section 1 of article 7 of our constitution, as to the qualifications of voters, applies not only to offices expressly provided for in the constitution but also to offices created by statute, and that the words "any election," used in that section, refer not only to each election for offices created by the constitution itself, but also to any election for offices created by the legislature; by appellees, that the qualifications of voters contained in said section apply only to the offices expressly provided for by the constitution.

The majority rests its opinion upon the doctrine of *stare decisis,* and holds that this question has been decided in *People* v. *English,* 139 Ill. 622, and *Plummer* v. *Yost,* 144 id. 68, and that the question of the power of the legislature to extend the right of suffrage to women for all offices created by it is not now an open one in this State. Whether the interpretation placed upon the constitution by the *English case, supra,* and the *Yost case, supra,* as they have been construed by the majority, is correct has not been discussed or argued in the majority opinion. I shall first take up the act under consideration, and discuss, without reference to the *English case, supra,* and the *Yost case, supra,* whether it is in violation of the constitution, and I shall then discuss what I conceive to be the proper construction of the *English* and *Yost cases* and the basis for the conclusions therein reached.

The question presented for our consideration in this case is one of construction, only. We are called upon to determine only whether the constitution has imposed any limitations upon the legislature in regard to prescribing the qualifications for voters for offices not expressly provided for by the constitution. In determining this question we are permitted simply to construe the constitution itself, and

to announce whether, from the language of that instrument, such a limitation has been imposed. We have nothing to do with the question of the policy of the State with reference to what the qualifications of a voter should be. Whether it is wise or unwise to restrict the right of suffrage is a matter upon which it is not proper for this court to express any opinion.

Our constitution is the fundamental law of the State. It constitutes the limitations imposed by the people themselves upon the legislature. Its provisions must not be ignored or lightly considered. By reason of the simplicity of its language it is not a difficult matter to construe this instrument and to determine definitely its true intent and meaning. In laying down the rules for the interpretation of constitutions, Mr. Justice Story says, in paragraph 451 of his work on the constitution: "In the first place, then, every word employed in the constitution is to be expounded in its plain, obvious and common sense, unless the context furnishes some ground to control, qualify or enlarge it. Constitutions are not designed for metaphysical or logical subtleties, for niceties of expression, for critical propriety, for elaborate shades of meaning, or for the exercise of philosophical acuteness or judicial research. They are instruments of a practical nature, founded on the common business of human life, adapted to common wants, designed for common use and fitted for common understandings. The people make them, the people adopt them, the people must be supposed to read them with the help of common sense, and cannot be presumed to admit in them any recondite meaning or any extraordinary gloss." I shall bear in mind this expression in construing the constitution as applied to the act under consideration.

Article 7 of our constitution deals with the question of suffrage. It is composed of seven sections, and as I will have occasion to refer to practically all of them I will set out the article in full. It is as follows:

"Sec. 1. Every person having resided in this State one year, in the county ninety days, and in the election district thirty days next preceding any election therein, who was an elector in this State on the first day of April, in the year of our Lord 1848, or obtained a certificate of naturalization before any court of record in this State prior to the first day of January, in the year of our Lord 1870, or who shall be a male citizen of the United States, above the age of twenty-one years, shall be entitled to vote at such election.

"Sec. 2. All votes shall be by ballot.

"Sec. 3. Electors shall, in all cases except treason, felony, or breach of the peace, be privileged from arrest during their attendance at elections, and in going to and returning from the same. And no elector shall be obliged to do military duty on the days of election, except in time of war or public danger.

"Sec. 4. No elector shall be deemed to have lost his residence in this State by reason of his absence on business of the United States, or of this State, or in the military or naval service to the United States.

"Sec. 5. No soldier, seaman or marine in the army or navy of the United States shall be deemed a resident of this State in consequence of being stationed therein.

"Sec. 6. No person shall be elected or appointed to any office in this State, civil or military, who is not a citizen of the United States, and who shall not have resided in this State one year next preceding the election or appointment.

"Sec. 7. The General Assembly shall pass laws excluding from the right of suffrage persons convicted of infamous crimes."

It is a well known rule, as appellees suggest, that the State constitution is not a grant of power but is a limitation on the otherwise sovereign power of the legislature, and where not prohibited by the constitution the legislature has full power to enact such legislation as it may see fit. Like most rules it is subject to an apparent exception.

The right to vote at political elections is not a natural or inherent one. It must be conferred by some body having the power to grant it. The right to vote was originally conferred upon the inhabitants of the territory of which the present State of Illinois was a part, by act of Congress. By the enabling act of April 18, 1818, Congress finally conferred upon certain citizens of the United States residing in the Territory of Illinois the right to vote for representatives to compose a convention to form a constitution and State government for the people within the territory. The constitution, in turn, granted the right of suffrage to certain persons. It is universally conceded that where the constitution prescribes the qualifications of the electors of the State those qualifications cannot be changed by the legislature, either by prescribing additional qualifications for voters at elections within the State or by extending the right of suffrage to persons not possessing the qualifications prescribed by the constitution. (Cooley's Const. Lim. 599; *People* v. *English,* 139 Ill. 622; *McCafferty* v. *Guyer,* 59 Pa. 109; *Coffin* v. *Board of Election Comrs. of Detroit,* 97 Mich. 188.) Section 1 of the suffrage article is therefore not merely a guaranty that the classes therein named shall not be deprived of the right of suffrage; it is a limitation upon the power of the General Assembly to grant the right to any persons, other than those named, to vote at such elections as are referred to in that section.

It is conceded at the outset, on the part of appellees, that no one except those designated in section 1 of the suffrage article of the constitution is entitled to vote for any office specifically provided for by the constitution. That section limits the right of suffrage to male citizens above the age of twenty-one years. A determination of what is meant by the words "any election," as used in this section,—that is, whether they refer only to such elections as are provided for by the constitution or whether they refer also to such elections as may be provided for by the legis-

264 — 22

lature,—will determine the question of the validity of the Woman's Suffrage act so far as the first objection made is concerned. That act specifically names the offices for which women are permitted to vote, and they are such offices as were not expressly provided for by the constitution. The list consists of presidential electors, members of the State Board of Equalization, clerk of the Appellate Court, county collector, county surveyor, members of board of assessors, members of board of review, sanitary district trustees, all officers of cities, villages and towns, except police magistrates, and the following township officers: Supervisor, town clerk, assessor, collector and highway commissioner.

The word "election" is necessarily used in the constitution in the sense of a political election, and is the method by which various officers for the government and administration of the affairs of the State, counties, townships and municipalities are selected. The use of the word in that sense is well understood. What constitutes an election? Is there anything in the constitution which indicates that the word is there used in any different sense than it had always been used by the legislature? The adoption of the constitution in 1870 did not operate to annul and wipe out all statutes of the State. No statute fell by reason of the adoption of the constitution except such as were clearly in conflict with its terms and provisions. Section 1 of the schedule of the constitution expressly provides "that all laws in force at the adoption of this constitution, not inconsistent therewith, * * * shall continue to be as valid as if this constitution had not been adopted." At that time many elections were provided for by the statutes, including the election of practically all the officers named in the Woman's Suffrage act, and these statutes were expressly continued in force. The constitutional convention was composed of eminent and learned men, who gave the preparation of each section of each article of the consti-

tution their most careful consideration. There is no indication anywhere in the provisions of the instrument that the members of the constitutional convention intended that the word "election," as used by them in the suffrage article, should have any special, local or unusual meaning, nor that they considered that the word "election," as therein used, would not include all offices created by the legislature as well as those specifically provided for by the constitution. The word "election" has never been understood to have a different meaning when applied to the selection of a Governor or any of the other State officers provided for by the constitution, than it has when applied to the selection of presidential electors or members of the State Board of Equalization, or such other officers as have a statutory origin. A political election has always been understood to be the act of choosing the governmental officers of the State, districts, counties, cities, villages and townships, without regard to whether the offices being filled at such election were of statutory or constitutional origin. One election may suffice for the selection of a number of these officers. The voting for a number of offices at the same time and on the same ballot does not constitute the holding of a separate election for each office. Where a number of offices are to be filled at the same time, the voting for all of them constitutes but a single election. Prior to the adoption of the constitution of 1870 many of the identical offices specified in the Woman's Suffrage act were filled at the same election with many of the offices perpetuated by that constitution.

By section 1 of the suffrage article it is provided that every person having resided in the State one year, in the county ninety days and in the election district thirty days "next preceding any election therein," and who possesses the required qualifications, "shall be entitled to vote at such election." The constitution nowhere provides for the creation of election districts. They were in existence at that time, having been created by the legislature, and neces-

sarily continued in existence under said section 1 of the
schedule.   An election district is a governmental subdivi-
sion of the county.   The constitution recognized its exist-
ence in prescribing the qualifications of voters.   The election
district at that time was, and since has been, the unit for
the holding of all political elections, whether for the selec-
tion of officers to fill the offices provided for expressly by
the constitution or to fill the offices created by the legisla-
ture.   It would be doing violence to the plain language of
the constitution to hold that when it referred to "any elec-
tion" held within an election district it meant to exclude
such elections as might be held to fill the offices created
by statute.

The conditions existing at and prior to the time of the
adoption of the constitution may properly be considered in
determining what was meant by the use of the words "any
election."   At the time the constitution was adopted, and
long prior thereto, presidential electors were voted for and
elected at the general elections in the State.   Cities and
towns had been incorporated and the election of the officers
for these municipalities had been provided for by the legis-
lature.   Townships had been organized and township offi-
cers, and their election had been provided for.   The office
of member of the State Board of Equalization had been
created and an election had been held for the same.   Thus
it will be seen that at the time of the adoption of the con-
stitution, and prior thereto, practically all of the officers
enumerated in the Woman's Suffrage act were elected
by the People, and in many instances were voted for and
elected at the same elections held for the offices which were
perpetuated by and specifically named in the constitution.
It will be noted that the constitution does not use such lan-
guage as "any election under this constitution," or "any
election named in this constitution," or "any election pro-
vided for by this constitution," or "any election for offices
named in this constitution."   It uses the broad, simple and

comprehensive term, "any election." When we consider that prior to the adoption of the constitution presidential electors, officers known as members of the State Board of Equalization, city officers and township officers were elected by popular vote in the same manner and under the same requirements as all other officers were elected, it seems to be conclusive as to the sense in which the words "any election" were used in the constitution.

That it was not intended to give these words the restricted meaning placed upon them by the majority is apparent from many of the provisions of the constitution. For instance, section 3 of the suffrage article provides that electors shall, except in certain cases, be privileged from arrest during their attendance at elections and in going to and returning from the same. Can it be seriously contended that it was meant to thus protect an elector attending an election for the purpose of voting for constable but such protection was not meant to be extended to one attending for the purpose of voting for presidential electors? Such a construction must follow if the act in question is valid. Under the contention of appellees, an "elector," as the word is used in the constitution, refers only to such as are qualified to vote for the so-called constitutional offices and does not apply to one voting for an office created by the legislature. This same section also provides that no elector shall be obliged to do military duty on the days of election except in times of war or public danger. Was it meant that only those who are qualified to vote for so-called constitutional offices were to be thus protected?

By section 4 of the suffrage article it is provided that no elector shall be deemed to have lost his residence in this State by reason of his absence on business of the United States or of this State or in the military or naval service of the United States. Was it intended by this section that one who is absent from his home, engaged on business of the United States of such a nature that his permanent resi-

dence is required to be at the seat of government, shall be protected in his right to vote for a justice of the peace but not in his right to vote for the important offices of member of the State Board of Equalization or of presidential electors? Almost every county ·in the State has one or more of its citizens thus absent on business of the Federal government. Such a person may have disposed of all his property in the county where he resided when he entered the service of the government and the circumstances be such that without this constitutional provision he has unquestionably lost his residence there, yet under this provision he is permitted at election times to return to the place where he resided when he entered into such service and there cast his vote for the candidates of his choice. If the constitution is to be construed as contended, such a citizen is protected only in his right to return and vote for such offices as. are specifically provided for by that instrument. ·That the legislature has never so interpreted this section of the constitution is evidenced by the fact that it has neither made such an exemption in favor of one thus absent on business of the United States nor provided for a separate ballot and a separate. ballot-box for his use, but, on the other hand, has adopted an act one section of which is in the language of section I of the suffrage article, and the succeeding section of which provides that "a permanent abode is necessary to constitute a residence within the meaning of the preceding section." If the constitution means what the appellees contend, then the legislature has disfranchised such a citizen by the provisions of our election laws. Under our Ballot law the names of all candidates to be voted for at any particular election are placed upon a single ballot, which the elector is required to take with him into a booth and mark in secret. Such a citizen would be deprived of his right to vote at all, as it would be highly im-· proper to place in his hands a ballot containing the names of candidates for offices for which he had lost his right to

vote by reason of his non-residence. It certainly was not the intention of the legislature to disfranchise this citizen, and if that is true, then the legislature has heretofore construed the words "any election," in section 1 of the suffrage article, to mean an election for an office created either by the constitution or by statute.

Section 5 of the suffrage article provides that no soldier, seaman or marine in the army or navy of the United States shall be deemed a resident of this State in consequence of being stationed therein. By making this a part of the article on suffrage the framers of the constitution made the purpose of this section quite evident. It was meant to prevent any soldier, seaman or marine in the army or navy of the United States from claiming to possess the qualifications of an elector and to prevent him from voting in the election district in which he resided at "any election therein." Under the doctrine of the majority opinion this section of the constitution may be rendered nugatory so far as offices created by the legislature are concerned. If there are no restrictions whatever upon the right of the legislature to prescribe the qualifications of voters for such offices as it creates, the persons prohibited by said section 5 from becoming residents, and thereby from becoming electors, may be permitted to vote for all except the so-called constitutional offices under a provision which the legislature would have the power to enact, allowing such persons to vote for all offices created by it.

The contention of appellees is also inconsistent with sections 6 and 7 of the suffrage article.

Section 18 of article 2 (the bill of rights) provides that "all elections shall be free and equal." If the constitution refers only to such elections as it has specifically provided for, then this guaranty extends only to a part of the elections which have always been held in this State, both before and since the adoption of the constitution.

Section 22 of article 4 provides that the General Assembly shall pass no local or special law for the opening and conducting of any election. If the legislature has the right to ignore the qualifications prescribed by section 1 of the suffrage article then it can ignore this limitation in so far as the elections for offices created by it are concerned. Section 22 of article 4 further provides, in part, as follows: "The General Assembly shall not pass local or special laws in any of the following enumerated cases, that is to say: For * * * providing for the election of members of the board of supervisors in townships, incorporated towns or cities." By this section the people, in adopting the constitution, recognized the fact that the law already had provided for the election of supervisors and guarded against the passage of local or special laws in reference to such elections. The act in question specifically gives to women the right to vote for supervisors. Without regard to whether this act may be special legislation in reference to providing for the election of supervisors, it is significant and helpful in construing what is meant by the use of the language employed in section 1 of the suffrage article. The members of the constitutional convention no doubt used the word "election" advisedly in said section 22. Can anyone say it was used in any different sense than in the suffrage article?

Section 32 of article 6 provides the method by which vacancies shall be filled in all the offices provided for in that article. When the unexpired term does not exceed one year it provides that a vacancy in the office of judge shall be filled by the Governor; of a clerk of court, by the court to which the office pertains; and of all other offices provided for in that article, which include various county offices, by "the board of supervisors or board of county commissioners in the county where the vacancy occurs." The constitution nowhere creates the office of a member of the board of supervisors or requires the election or appoint-

ment of such an officer. That fact was appreciated and taken advantage of by the legislature when it included supervisors in the list of offices for which women were authorized to vote. Article 10 relates to counties, and directs the General Assembly to provide by general law for township organization, permitting the electors of each county to determine whether they shall have township organization or not. At the time of the adoption of the constitution many of the counties of the State were not under township organization. Many others were under township organization and were authorized by statute to elect members of the board of supervisors to conduct the affairs of the county. It will be observed that each of the offices enumerated in article 6 which the board of supervisors is authorized to fill by appointment in case of vacancy is necessarily a constitutional office, and its incumbent can be elected only by electors possessing the qualifications prescribed by section 1 of the suffrage article. It is conceded that women are not permitted, under the constitution, to vote for such offices, yet by the terms of the act under consideration they may vote for, and themselves constitute, members of the board of supervisors, who, in turn, are empowered by the constitution to fill vacancies occurring in such so-called constitutional offices.

Article 10 further provides that in each county of the State not under township organization a board of county commissioners shall be elected to transact the business of the county as shall be provided for by law. Will anyone contend that the constitution contemplates one qualification for an elector for the office of county commissioner and another and different qualification for an elector for supervisor? The functions of the two offices are the same, the only difference being that in counties under township organization all county affairs are managed by the board of supervisors, whereas in counties not under township organization that power and duty are vested in and devolve upon

the board of county commissioners. Why should women be permitted the right to vote for one of these offices and denied the right to vote for the other?

Section 28 of article 4 of the constitution provides that "no law shall be passed which shall operate to extend the term of any public officer after his election or appointment." If the theory of the majority is correct, then this section of the constitution applies only to such officers as have been provided for by the constitution itself. If it does not apply to officers whose offices have been created by the legislature, then it is possible for the legislature to extend the term of any such officer for such time as it may choose, without compelling him to submit the question of his re-election to the voters. It seems too clear to me to admit of argument that the election referred to by said section 28 means any election, whether it be of an officer whose office was expressly provided for by the constitution or created by the legislature.

Section 5 of article 10 requires the General Assembly to provide by general law for the adoption of township organization by any county. This section further provides, "and in any county that shall have adopted a township organization, the question of continuing the same may be submitted to a vote of the electors of such county, at a general election," etc. If the act under consideration is valid then we have presented to us this situation: Women possessing the qualifications prescribed may vote for the township offices enumerated in the act, but the electors of such county,—that is, the electors recognized and defined by the constitution, male citizens above the age of twenty-one years,—are the only persons authorized to vote upon the question whether township organization will be continued and women or anyone else given the further opportunity to vote for township offices.

By section 11 of article 10 it is provided that the fees of township officers shall be uniform in the class of counties to

which they respectively belong, thus again expressly recognizing the existence of township organization and township officers. Section 12 of article 10 also provides that all laws fixing the fees of township officers shall terminate with the terms of those who may be in office at the meeting of the first General Assembly after the adoption of the constitution, and that the General Assembly shall by general law provide for and regulate the fees of said officers and their successors. The fact that municipal corporations then existed and would continue to exist and to elect officers is recognized by sections 9 and 11 of article 9, which provide that the General Assembly may vest the corporate authorities of cities, towns and villages with certain powers, and that no person who is in default as collector or custodian of money or property belonging to a municipal corporation shall be eligible to any office in or under such corporation, and that the fees, salary or compensation of any municipal officer who is elected or appointed for a definite term of office shall not be increased or diminished during such term.

Other sections of the constitution might be pointed out as having a bearing upon this question, but I do not deem it necessary to make any further comparisons. That by section 1 of the suffrage article the people of the State, on the adoption of the constitution of 1870, meant to restrict the right of suffrage at all elections, whether for offices provided for by the constitution or created by statute, is evident. If it would be helpful to be advised of the construction put upon this section by the framers of the constitution, a reference to the constitutional debates would clearly furnish it. I do not deem it necessary, however, to make any specific reference to the constitutional debates. It seems to me to be inconceivable that the members of the constitutional convention in submitting this instrument, and the people in adopting it, intended that the right of suffrage should be restricted to male citizens of the age of twenty-one years and upwards for all offices

created by it, whereas the qualifications of voters for any other office which had theretofore been or might thereafter be created by statute should be determined by the legislature. It is highly improbable that reasonable men should determine that no one except male citizens above the age of twenty-one years should have the right to vote for constable, justice of the peace or police magistrate, and then leave it to the legislature to say that not only females, but even aliens, non-residents and infants, might vote for the important offices of presidential electors or member of the State Board of Equalization. Is it possible that the people by the adoption of the constitution intended to require a higher qualification for one desiring to vote for police magistrate than for the mayor or councilmen of the city, or that the qualifications of one desiring to vote for constable should be more strict than of one desiring to vote for supervisor? I think it clear, from a consideration of the constitution itself, that the right of suffrage at all political elections was meant to be extended only to male citizens above the age of twenty-one years, and that the words "any election" refer not only to such elections as are provided for by the constitution, but to such as are provided for by the legislature.

In a number of the States of the Union suffrage has been extended to women upon equal terms with men, but in each instance this right has been conferred by express constitutional provision. In some of the States the right was conferred by the original constitutions adopted at the times such States were admitted into the Union. In six other States having constitutions similar to ours it was deemed necessary to amend the constitution in order to confer this right of suffrage upon women. While the action of those States in thus amending their constitutions is not conclusive that they deemed their legislatures without power to extend the partial right of suffrage to women which our legislature has attempted to give them, it is sig-

nificant, nevertheless, that in no instance did the legislature of any of those States assume to have the power to extend the right of suffrage in the absence of express constitutional authority.

I come now to the consideration of the question whether our constitution has been so construed by the *English case, supra,* and the *Yost case, supra,* as to permit the legislature to pass such an act as the one under consideration. I confess at the outset of this discussion that if the question presented by the *Yost case* were to be now presented as an original proposition my view would be that the act there involved is unconstitutional. I do not deem the *English case* to have any bearing whatever upon the question here under consideration. While I do not believe that the *Yost case* was decided upon a logical basis, when the ground for that decision is considered and the cases upon which it is based have been carefully analyzed it will be seen that the *Yost case* will not bear the construction placed upon it by the majority. If, as the majority opinion holds, the *English* and *Yost cases* have determined the question of the power of the legislature to extend the right of suffrage to women for all offices created by it, then I would favor overruling those cases, as I consider the inroad made by the act under consideration upon the limitations prescribed by the constitution to be so momentous that no decision of this court ought to be permitted to stand as against the plain provisions of the constitution. As I have stated, I do not regard that either the *English case* or the *Yost case* holds as it has been construed by the majority opinion. In the *English case* the only question involved was whether the legislature had power to confer upon women the right to vote for county superintendent of schools, and it was held that it did not have such power, as to confer that right would be in violation of the constitution. Whether the legislature could give women the right to vote for school directors and other school officers not mentioned in the

constitution was not decided but that question was expressly reserved. It was pointed out that the office of county superintendent of schools was created by the constitution and the election of that officer provided for by that instrument. No one questions the proposition that anyone except an elector specified in the constitution can vote for any office which is expressly created by the constitution and the election for filling which is provided for by that instrument. It is frankly conceded by appellees in this case that there is no authority for the position that anyone except qualified electors specified in the constitution can vote for any office expressly provided for in that instrument. It would seem, then, that there can be no question of the soundness of the holding in the *English case.*

The majority opinion calls attention to the quotation found in the *English case* from *Belles* v. *Burr,* 76 Mich. 1. From this isolated quotation some basis for the position of the majority can be found, but when the real basis of the holding in *Belles* v. *Burr, supra,* has been ascertained, the claim which the majority make as to the effect of this quotation is destroyed. I shall hereafter discuss at length the case of *Belles* v. *Burr, supra,* and point out the basis for the holding of the Michigan court in that case. It can hardly be presumed that this court, in the *English case,* quoted from *Belles* v. *Burr* without any regard to the view taken by the Michigan court in that case.

In *In re Gage,* 141 N. Y. 112, decided by that court since the decision in the *English case,* a distinction was made that might well have been pointed out in both the *English* and *Yost cases.* The question considered in the *Gage case* was whether a woman might vote for school commissioner in her proper district within the State. The court said: "To that class of school officers entrusted with the government and control of the simple school district by itself, alone, and within its own boundaries, the constitutional provisions have never been applied, but I

have yet to find an instance in the statutory history of the
State prior to the act in question where an officer whose
authority was not confined to the school district but ex-
tended over many of them, with a power of superintend-
ence and control, has been regarded as anything other than
a town or county officer and within the constitutional pro-
visions." After setting out the history of legislation rela-
tive to the election of superintending school officers the
opinion proceeds: "It follows that there are two definite
and distinct classes of school officers, which are, those of
the school district,—the unit of the system,—and those of
superintendence over a larger or smaller number of such
units aggregated, and that the latter are, and always have
been, as clearly either town or county officers as the for-
mer have not been. I am unable to see, therefore, that
any practical construction, prior to the act of 1892, has
ever been given to the constitution which takes the elective
officers charged with superintendence out of the category
of constitutional officers or puts a constituency behind them
having other qualifications than those necessary for the
election of town and county officers. The constitution, in
article 2, section 1, prescribes the qualifications of voters
'for all offices that now are or hereafter may be elective by
the people,' and confines the franchise specifically to 'male
citizens.' The office of school commissioner was one there-
after made 'elective by the people' through the operation
of the alternative given by article 10, section 2, which pro-
vides that 'all officers whose offices may hereafter be created
by law shall be elected by the people or appointed as the
legislature may direct,'—that is, in such cases it may choose
between election and appointment, and in the latter event
may dictate the authority and mode of appointment. The
legislature chose that the office should be elective, and, be-
coming such, it fell within the scope and terms of the con-
stitutional provisions applicable to elections by the people.
The only possible answer is the one which was attempted

and derived from a supposed practical construction. We have seen that the facts do not justify that answer. Indeed, the cases cited from other States do not go far enough to support the appellant's argument."

The *Yost case* is more particularly relied upon by appellees and forms the chief basis for the majority opinion. That was a contest over the election of members of the board of education of a school district, and the question raised was as to the right of women to vote at that election pursuant to an act of the General Assembly giving women the right to vote for any officer of schools, under the general or special school laws of the State, at elections held in the school district. We referred to and quoted from the *English case,* and after pointing out that the question raised in the *Yost case* was left open by the opinion in the *English case,* we called attention to the fact that by article 8 of the constitution it was made the duty of the General Assembly to provide for a thorough, efficient system of free schools, where all the children of this State may receive a good common school education, and that the mode in which the required system of free schools should be organized, and the officers by whom it should be controlled and directed and its affairs administered, was left to the legislative discretion of the General Assembly. After pointing out that it was held in the *English case* that the State superintendent of public instruction and the county superintendent of schools must be elected by electors possessing the qualifications prescribed in section 1 of article 7 of the constitution, we said: "But the constitution contains no direction as to what other school offices shall be created or as to the mode in which the incumbents of those offices shall be designated and chosen. Those matters are left wholly to the discretion of the General Assembly. * * * The General Assembly having complete control of the subject, had, of course, the power to provide for the choice of these officers by popular vote, but such an election is not

necessarily a proceeding identical with the elections provided for by the constitution, nor is it necessary that the qualifications of those voting for school officers should be the same as those of electors, as defined by the constitution." This holding is in harmony with that of many other jurisdictions. The election of district school officers has generally been regarded as not controlled by the suffrage articles of the constitutions of the various States, and the various legislatures have been permitted to prescribe such qualifications for voters at district school elections as they should see fit. In some instances additions to the qualifications prescribed for electors in the constitution have been made. In other instances certain restrictions have been removed and a larger class has been given the right to vote at such elections or meetings. Legislatures have thus generally been permitted to proceed in this matter without regard to such qualifications as the constitution prescribes for electors. This may have arisen originally from the fact that the school district rarely, if ever, coincided with the election district. It may have been for the reason that public school districts were regarded in the light of *quasi* public corporations, doing the same work and having in view the same object that private institutions of like character were doing and had in view.

In the *Yost case* two cases were discussed and relied upon and two others were referred to. The earliest of the cases cited and discussed was *Wheeler* v. *Brady*, 15 Kan. 26. That was a contest for the selection of a school district treasurer, and the question involved was the right of women to vote for this office at a school district meeting. Section 1 of article 5 of the constitution of Kansas, as it then existed, read, in part, as follows: "Every white male person of twenty-one years and upward, belonging to either of the following classes, who shall have resided in Kansas six months next preceding any election and in the township or ward in which he offers to vote at least thirty days

264 – 23

next preceding such election, shall be deemed a qualified elector." The statutes of Kansas at that time provided that all white female persons over the age of twenty-one years, possessing certain qualifications, should be entitled to vote at any district school meeting. In passing upon the constitutionality of the act the court calls attention to the section of the suffrage article just quoted, and points out that the elections there contemplated were to be held in the township or ward, neither of which was co-extensive with the school district. By section 2 of article 4 of the Kansas constitution but two elections were provided for, that section being, in part, as follows: "General elections and township elections shall be held biennially on the Tuesday succeeding the first Monday in November in the years bearing even numbers." These were the only elections provided for by that constitution. Section 1 of article 15 provided that "all officers whose election or appointment is not otherwise provided for shall be *chosen* or appointed, as may be prescribed by law." The right of the legislature to provide for the formation and regulation of public schools was recognized by the constitution. After calling attention to the provisions of the constitution which I have pointed out, as well as to other provisions, the court in that case said: "Now, as we have before stated, there is no school district election or meeting provided for in the constitution. There is no provision as to how school district officers shall be elected, appointed or *chosen,* and we suppose no one will claim that they are by the terms of the constitution to be elected at either of the elections provided for in the constitution; hence it would seem that the legislature would have full and complete power in the matter; that the legislature might provide for the election or appointment of school district officers as it should *choose,* when it should *choose,* in the manner it should *choose* and by whom it should *choose.*" I have italicized the words of this opinion and of the Kansas constitution which I

think are significant of the ground upon which the court based its decision. Thus it will be seen that the Kansas decision is based upon a construction of its own constitution, and not, as are the decisions of many other jurisdictions, upon the right the legislature has assumed to possess to exercise complete control over the election of school district officers.

*State* v. *Cones*, 15 Neb. 444, is cited in the *Yost case* as presenting a state of facts very similar to those appearing in *Wheeler* v. *Brady, supra,* and as being decided the same way and upon the same principles. While *State* v. *Cones, supra,* cites *Wheeler* v. *Brady, supra,* and relies upon it, there is nothing else in the opinion to indicate that the facts were similar. In that case a section of the Nebraska statute is referred to which provides that every voter, and every woman who has resided in the district forty days and is over twenty-one years of age, and who owns personal property assessed in his or her name, shall be entitled to vote at any district school meeting. The opinion then states: "An examination of the constitution will convince anyone that the provisions in regard to electors were not intended to apply to school districts. The organization of district schools is one of the modes by which the State provides for the education of all persons residing therein between the ages of five and twenty-one years. The continued existence of free government depends to a great extent upon the intelligence, love of right and good morals of the people. That women are successful educators is fully shown by experience, and the common law permitted them to fill any office of an administrative character the duties of which they were competent to discharge. The statute merely permits women possessing the qualifications to have a voice in the choice of school officers, selection of teachers and general management of schools, and, being entitled to vote, they are also entitled to act as trustees. We have no doubt, therefore, that the act allowing women

possessing the qualifications prescribed in the act to vote at school meetings is constitutional and valid."

The *Yost case* refers to *Opinion of Justices*, 115 Mass. 602. That was an answer given by the justices of the Supreme Court of Massachusetts to an interrogatory propounded by the General Assembly, whether, under the constitution of Massachusetts, a woman can be a member of a school committee. The question was answered in the affirmative, upon the ground that "the common law of England, which was our law upon the subject, permitted a woman to fill any local office of an administrative character the duties attached to which were such that a woman was competent to perform them," and that the duties of a school committee were of such a nature that they could be well and efficiently performed by women. In that case the question whether a woman, under the constitution of Massachusetts, could be permitted to vote for school district officers was not involved, and it therefore throws no light upon that question.

The other case discussed, and the one chiefly relied upon, in the *Yost case* was *Belles* v. *Burr,* 76 Mich. 1. This is a well considered case, and points out clearly the ground upon which it bases the holding that the legislature may prescribe qualifications for voters at school district meetings different from the qualifications prescribed for electors in the constitution. The School law of Michigan provided that every person twenty-one years of age who has property liable for assessment for school taxes in any school district, and who has resided in the district three months next preceding any school meeting, should be a qualified voter at the school meeting upon all questions, and that all other persons twenty-one years of age who are the parents or legal guardians of any children included in the school census of the district, and who have been residents in the district for three months at the time of holding any school meeting, should be entitled to vote on all questions which

do not directly involve the raising of money by taxation. It was contended that this statute, in so far as it attempted to confer upon women the right to vote, was in violation of. a provision of the constitution similar to section 1 of article 7 of our constitution. The constitution of Michigan which was being considered in that case was adopted in 1850. A previous constitution had been adopted in 1835. The constitution of 1850 contained an educational article similar to that afterwards incorporated in our constitution. The suffrage article of the constitution of 1835 provided that in all elections every white male citizen above the age of twenty-one years who had resided in the State six months preceding any election should be entitled to vote at such election. That constitution also directed the legislature to provide for a system of common schools. The court points out in *Belles* v. *Burr* that in 1838 the Michigan legislature provided for a system of primary schools, which included the formation of school districts and the selection of a moderator, director and assessor at an annual meeting; that it also provided that "every white male inhabitant of the age of twenty-one years, residing in such district, liable to pay a school tax, shall be entitled to vote at any district meeting;" that in 1846 this provision was amended by adding thereto the following: "And all persons who are entitled by the laws of this State to vote at township and county elections, and residing in said district, shall be entitled to vote on all questions arising in said district excepting when the raising of money by tax is in question," etc.; and that in 1847 this section was again amended by striking out that portion which had been added in 1846, and the statute remained in this form until after the adoption of the constitution of 1850. It will thus be seen that the Michigan legislature had assumed to possess the power to name the qualifications for voters at district school meetings and prescribed different qualifications than were prescribed by the constitution for the electors therein named.

In discussing the question the court said: "It requires but a cursory review of the above *resume* to show that the qualifications of voters for school officers, or upon questions arising at school meetings, have never been identical with those of electors, as defined in the constitution.  *  *  * Viewing the question historically, it is apparent that for fifty years it has never been considered that the qualifications of voters at school district meetings must be identical with those prescribed in the constitution as qualifications of electors entitled to vote under that instrument.  The authority granted by the constitution to the legislature to establish a common or primary school system carried with it the authority to prescribe what officers should be chosen to conduct the affairs of the school districts, to define their powers and duties, their term of office, and how and by whom they should be chosen.  School districts are regarded as municipal corporations.  (*School District* v. *Gage,* 39 Mich. 484; *Sceley* v. *Board,* id. 486.)  As such they preceded the constitution (*Stuart* v. *School District,* 30 Mich. 69,) and were recognized by that instrument.  (Const. 1835, art. 10, sec. 3; Const. 1850, art. 13, sec. 5.)  But no officer of the school district is mentioned or recognized by that instrument.  The reason is, that the whole primary school system was confided to the legislature, and it cannot be said that the officers of school districts chosen pursuant to the system adopted by the legislature are constitutional officers.  The constitution provided for no municipal subdivisions smaller than towns, except cities and villages, and it authorized the legislature to incorporate these.  (Const. 1850, art. 15, sec. 13.)  While it must be conceded that no person can vote for the election of any officer mentioned in the constitution unless he possesses the qualifications of an elector prescribed by that instrument, it does not follow that none but such electors can vote for officers which the legislature has the right to provide for, to carry out the educational purpose declared in that instrument."  Morse, J.,

filed a concurring opinion, which becomes important in view
of a later decision of the Michigan court.  In his concur-
ring opinion Justice Morse said: "The law thereafter re-
mained as in 1838 until 1855, and was in force at the time
the present constitution was adopted, in 1850.  Therefore
for twelve years before 1850 the electors at school meet-
ings had possessed different qualifications than those of
electors under the constitution of 1835 and from the be-
ginning of our school system. This must have been known
to the framers of our present constitution, and they must
have acted in reference to it when they ordained article 13,
section 4, of the constitution of 1850."  The subsequent
amendments to the School law are then set forth, and the
opinion then proceeds: "In view of this history of the
qualifications of voters at school meetings since the first
formation and development of our common school system
in this State, I am constrained to concur with Mr. Justice
Champlin in the opinion that the qualifications of an elector
at school meetings have never been identical with those of
an elector under the constitution; and in view of this fact
it must have been the intention of the framers of the con-
stitution of 1850 when they provided that the legislature
should establish a school system, following the constitution
of 1835 in that respect, that under such provision the leg-
islature should have full power to fix and determine the
qualifications of voters under such system, and this with-
out regard to the qualifications prescribed by the constitu-
tion for electors at other elections.  To hold otherwise, it
seems to me, would be to ignore the fact that the members
of the constitutional convention of 1850 were men of intel-
ligence and practical common sense, and must have known
what the practice of the legislature had been under the
constitution of 1835, and what it would naturally be, fol-
lowing precedents, under the present constitution, unless
they inserted therein some prohibition against enlarging the
right of suffrage or prescribed what the qualifications of

voters should be at school district meetings. This they did not do, and the inference is plain to me, and the conclusion, to my mind, irresistible, that the convention of 1850 meant to confer upon the legislature the same power that they had exercised in this respect under the constitution of 1835, and that they did do so by article 13, section 4."

The case of *Belles* v. *Burr* clearly sets out the ground upon which it is held in most jurisdictions that the suffrage article of the constitution was not intended to prescribe the qualifications of voters at district school meetings. From the language used in *Belles* v. *Burr,* and from the fact that it was the principal case cited and relied upon in the *Yost case,* it is apparent that the decision in the *Yost case* was based upon that ground. The Michigan constitution discussed in *Belles* v. *Burr* was adopted twenty years before the adoption of our present constitution. It contained an article on education similar to the one incorporated in our constitution of 1870. In thus incorporating this article on education in our constitution, it must be presumed that it was done with full knowledge that in States where the same or similar articles were contained in constitutions, the legislatures had been permitted to assume, under those articles, the power to prescribe such qualifications as they saw fit for voters at school district elections, and if it was not intended that the legislature should have that power under that article of our constitution, it should have been expressly prohibited.

It is a matter both of interest and importance to note the state of the law in each of the States of the Union in reference to the qualifications prescribed for voters at school district elections at the time of the passage of the act of 1891, which was involved in the *Yost case.* At that time the legislatures of sixteen States having suffrage articles in their constitutions similar to that of Illinois had passed laws prescribing different qualifications for voters at school district elections than those prescribed by the general suf-

frage articles of their several constitutions. Of these sixteen States fifteen had constitutions in force at that time containing educational articles or clauses. At that time school district officers were made appointive by statute in seven other States. In five States the election of school district officers was controlled by constitutional provisions. In one State it was provided by statute that qualified voters, only, should be permitted to vote for school district officers, but that only those who had property subject to taxation upon which taxes were paid would be entitled to vote upon any proposition affecting the expenditure of money or the raising of money by taxation. The remainder of the States, fourteen in number, at that time prescribed the same qualifications for voters at school district elections as were prescribed for electors by their several constitutions, Illinois having by the passage of that act become the seventeenth State which prescribed special qualifications for voters at school district elections. Soon after the passage of the Illinois act several of the fourteen States which had theretofore required the same qualifications for voters at school district elections as those contained in their respective constitutions, prescribed by statute different qualifications for voters at school district elections, thus adding to the number of States wherein the legislatures had assumed to prescribe special qualifications for voters at school district elections. It is a significant fact that in but few instances did the legislatures of any of these States thus assuming the right to prescribe special qualifications for voters at school district elections assume to have the right to prescribe different qualifications for voters at the election of officers not specifically provided for in their constitutions. In the majority of the instances where the legislatures did attempt to extend that doctrine the courts held that such action was in violation of the constitution of the State where such enactment was made.

In 1893 the legislature of Michigan enacted a statute providing that in all school, village and city elections thereafter held, women who are able to read the constitution of the State of Michigan, printed in the English language, should be allowed to vote for all school, village and city officers, and on all questions pertaining to school, village and city regulation, on the same terms and conditions prescribed by law for male citizens. In *Coffin* v. *Board of Election Comrs. supra,* the validity of that act was determined. The contention there was, that the act was in violation of the suffrage clause of the constitution. The same arguments were there advanced as have been urged upon us in the present case in favor of the validity of the act. *Belles* v. *Burr, supra, Wheeler* v. *Brady, supra, State* v. *Cones, supra,* and *Plummer* v. *Yost, supra,* were there relied upon as they are here. In holding the act invalid the court said: "The general rule is, that the source of all authority to vote at popular elections is the constitution, that the electorate is constituted by the fundamental law, and that the qualifications of electors must be uniform throughout the State. * * * Section 1 of article 7 of the constitution provides who shall be electors and entitled to vote, and is, according to its terms, applicable 'in all elections.' To empower the legislature to confer the elective franchise upon classes of persons other than those named, some other provision must be pointed out which confers that authority in express terms or by necessary implication. The only provisions to which we are cited are sections 13 and 14 of article 15, which are as follows: 'Sec. 13.—The legislature shall provide for the incorporation and organization of cities and villages. Sec. 14.—Judicial officers of cities and villages shall be elected, and all other officers shall be elected or appointed at such time and in such manner as the legislature may direct.' In support of the act in question it is contended that the sections last quoted empower the legislature to provide qualifications for voters in village

and city elections, and *Belles* v. *Burr*, 76 Mich. 1, *Wheeler* v. *Brady*, 15 Kan. 26, *State* v. *Cones*, 15 Neb. 444, *Opinion of Justices*, 115 Mass. 602, *Plummer* v. *Yost*, 144 Ill. 68, are relied upon to support this contention. These cases involved the validity of acts conferring upon females the right to vote for school district officers under constitutions which, like our own, name no school district officer, do not prescribe or suggest how such officers shall be chosen, but in express terms relegate to the legislature the duty of providing for and establishing a system of primary schools." The court then quotes that portion of the majority opinion in *Belles* v. *Burr, supra,* which I have above quoted, and after quoting from the concurring opinion of Mr. Justice Morse and the dissenting opinion of Mr. Justice Campbell, proceeds: "The majority in that case held that the constitution of 1835, as well as that of 1850, had, in terms, authorized the legislature to construct a primary school system, and that for years antedating the present constitution the legislature had construed a similar provision as conferring the power to determine the qualifications of voters for district school officers." Referring to the question under discussion the court then said: "The legislature had for many years prior to the adoption of the present constitution exercised the power of providing for the incorporation of cities and villages, and in the exercise of that power had in each instance determined what officers should be elected and what appointed, and the time and manner of both election and appointment. * * * Yet this is the first instance in which the legislature has attempted to extend the right of suffrage to persons other than those named in the constitution. Many of the charters granted for the incorporation of cities and villages contain no reference whatever to the qualifications of voters. The power to provide for the incorporation of cities is not unlike that given for the organization of counties, and the authority to direct the time and manner in which judicial of-

ficers shall be elected and the other officers elected or appointed does not involve the power to determine who shall constitute the electorate. * * * The constitution had already provided for electors, and when it provides that an officer shall be elected it certainly contemplates an election by the electorate which it has constituted. No other election is known to the constitution, and when it provides that the legislature may direct the manner in which an officer shall be elected, it simply empowers the legislature to provide the details for. the holding of such election." It will thus be seen that the Michigan court did not consider *Belles* v. *Burr* as holding the doctrine contended for in the *Coffin case,* and that it construed the *Yost case* as based upon the same ground as its own decision in *Belles* v. *Burr.*

Although the *Yost case* is based principally upon *Belles* v. *Burr, supra,* the majority hold that the bases of these two cases are entirely different and that the *Yost case* was decided, not upon the proposition that the legislature had been permitted to assume, by reason of the educational article in our constitution, to prescribe different qualifications for electors at school district meetings, but upon the proposition that the legislature had the right to prescribe such qualifications as it should see fit for so-called non-constitutional offices. If that was the view of the court when the *Yost case* was decided, why was it necessary for it to discuss, as it did at some length, article 8 of the constitution, commonly known as the educational article? Unless the holding in the *Yost case* was placed upon the same basis as the holding in *Belles* v. *Burr, supra,* why was it necessary for this court to make any reference whatever to the educational article of the constitution? As I have pointed out, the educational article of the Michigan constitution played an important part in the determination of *Belles* v. *Burr,* and the only purpose this court could have had in discussing the educational article of our constitution in the *Yost case* was to

indicate, in connection with the reliance placed upon *Belles* v. *Burr*, the basis of the holding in that case.

The position taken by the majority of the court in this case establishes a peculiar relationship between *Belles* v. *Burr, supra, Coffin* v. *Board of Election Comrs. supra,* the *Yost case* and the present case. In the *Yost case* we relied upon *Belles* v. *Burr,* in which the Michigan court very clearly and unmistakably stated the basis of its holding. In the *Coffin case* the Michigan court referred to the *Yost case* as being in harmony with *Belles* v. *Burr* and placed upon the same basis. Either this court misconstrued the holding in *Belles* v. *Burr* when it relied upon it in the *Yost case,* or the Michigan court in the *Coffin case* misconstrued both what it had held in *Belles* v. *Burr* and what this court held in the *Yost case.*

In *Harris* v. *Burr,* 32 Ore. 348, the question whether women were entitled to vote at a district school meeting for director was involved. The statute of that State permitted a woman twenty-one years of age, owning property in the district upon which she pays a tax, to vote at such meeting. The constitution provided that male citizens, only, should be entitled to vote at all elections authorized by law. The constitution also contained an article on education and school lands, whereby the legislature was directed to provide by law for the establishment of a uniform and general system of common schools. The court there held that women had the right to vote at such district school meeting, and based its decision upon the same grounds as *Belles* v. *Burr* and *Coffin* v. *Board of Election Comrs. supra.* In the Oregon case the *Yost case,* and each of the cases cited therein, were referred to. The court quoted at some length from *Belles* v. *Burr,* and after discussing that case the *Yost case* was correctly referred to as one of similar tenor. It was pointed out that when the Oregon constitution was adopted a Territorial law was in force which prescribed different qualifications for voters at school meetings than

those prescribed by the act of Congress authorizing the Territorial government of Oregon and the suffrage provision enacted by the Territorial legislature; that the constitution continued all the laws of the Territory consistent therewith in force until altered or repealed, and that after the adoption of the constitution the legislature continued to prescribe different qualifications for voters at school elections than were prescribed by the constitution. The court then said: "Thus we have a direct legislative interpretation of the fundamental law, not only approximately contemporaneous with the adoption of that instrument, but by its every subsequent act whenever it has legislated upon the subject. If we ascribe to the constitutional convention cognizance of the laws of Congress, and the Territorial regulations thereunder, touching the common school system, as we must because of the learning and sagacity of its members, there is strong reason for believing that they legislated fundamentally with reference to the conditions as they found them, especially as we find the legislature of 1862, so near the time of the adoption of the constitution and composed of some of the same members, revising the school system, and to that end specially repealing acts at least supposed by them to have been carried over and continued operative by the very terms of the constitution itself. These considerations lead to the conclusion that the power ascribed to the legislature, under the constitution, to provide for the establishment of a uniform and the general system of common schools carries with it plenary power to establish the unit of that system, denominated a school district, to determine what officers shall administer its affairs, who and what manner of persons shall be eligible to office and how and by whom they should be chosen. The elective franchise conferred by section 2, article 2, does not, nor was it intended to, fix and define the qualification of voters at school meetings, but was designed only to govern in all general and special elections not otherwise provided

for by the constitution, and applies to the election of all officers known to the constitution as well as to such as may be provided for thereunder, aside from those provided for under the special power of the legislature to establish a uniform and general system of common schools."

Among the cases cited and relied upon in the Oregon case was *In re Gage, supra.* In the *Gage case* the court said: "He [referring to counsel for appellant] concedes that under article 2, section 1, and article 10, section 2, of the constitution, no woman has the right to vote for constitutional officers because the franchise is conferred explicitly upon 'male citizens;' but he contends that school officers are not such constitutional officers because the practical interpretation of that instrument has long and invariably been to the contrary. That is true, and only true, of the officers of the school district, as the fundamental unit of the school system. The trustees of such a district are the authorized business managers of the school within its boundaries, and the legislature has always assumed, and been permitted to assume, the right to determine who might vote for such trustees and what qualifications should or should not be requisite and necessary."

The *Yost case* is cited in support of the position taken by the New York court in *In re Gage.* In *Menton* v. *Cook,* 147 Mich. 540, the Michigan court again refers to the *Yost case* as in harmony with its former decisions. In *State* v. *Board of Elections,* 9 Ohio Cir. Ct. 134, in discussing the question of the constitutionality of an act conferring upon women the right to vote at school district elections, (an act which was passed since the Illinois act of 1891,) the circuit court referred to the Michigan case and also to the *Yost case.* In referring to the disposition of the matter in the Michigan courts the Ohio court said: "These questions have been determined by the Supreme Court of Michigan under constitutional provisions that are certainly not more favorable to the power of the legislature to pass an act of this

character than are ours." And again, in referring to the holdings in the two Michigan cases, the court said further: "This conclusion is placed upon the ground that 'the authority granted by the constitution to the legislature to establish a common or primary school system carried with it the authority to prescribe what officers should be chosen to conduct the affairs of the school districts, to define their powers and duties, their term of office, and how and by whom they should be chosen.' This result was reached although, as was shown in a dissenting opinion, the election of other school officers is provided for by the constitution of that State." After referring to the *Yost case* as one holding the Illinois act valid upon like reasoning, the court then said: "It must be admitted that the rule that persons not having the constitutional qualifications of electors may be authorized to vote at any election that is not held to fill an office created by the constitution does not obtain everywhere, * * * but it is believed that all the reported cases in which this limitation has been considered are consistent with the view that the ample powers for the establishment and maintenance of public schools which are conferred upon the legislatures by the constitutions of most of the States carry with them power to extend the right to vote for school officers to persons not within the constitutional definition of electors, unless such officers are designated by the constitution or are officers of municipal or political divisions recognized by the constitution." This case was appealed to the Supreme Court of Ohio and was affirmed by a memorandum decision in 54 Ohio St. 631.

The Oregon court, in *Livesly v. Litchfield,* 47 Ore. 248, again referred to the *Yost case,* and construed it as it had been theretofore construed by that court and by the courts of Michigan, New York and Ohio, and the *Yost case* is there referred to as one which illustrates and points out the distinction between the right to vote at a school district meeting and at an election for city and municipal officers.

The *English case* and the *Yost case* will thus be seen to be in harmony with the holdings of the courts of other States which have constitutions similar to ours. As the legislatures of other States had assumed, and been permitted to assume under the educational article of their constitutions, the right to determine who should vote for district school officers and what the qualifications of such officers should be, so the right of our legislature, by the holding in the *Yost case,* as I construe it, to assume the same power under the educational article of our constitution was recognized.

In none of the States having constitutions similar to ours has the right of suffrage been extended to women otherwise than in respect to school district meetings or elections. In Michigan, where it was claimed that the legislature had the same power that it is now claimed our legislature has and where the same cases were relied upon as authority, the right was denied. In Kansas the legislature never presumed to extend the doctrine announced in *Wheeler* v. *Brady* beyond elections for district school officers, but when it was desired to further extend the franchise to women it was done by amendment to the constitution.

The majority opinion cites *State* v. *Dillon,* 32 Fla. 545, *Buckner* v. *Gordon,* 81 Ky. 665, and *Hanna* v. *Young,* 84 Md. 179, in support of the conclusion reached. The suffrage clause of the constitution of Florida provides that certain male persons therein described shall, under the conditions there indicated, be deemed qualified electors "at all elections under this constitution." In reading *State* v. *Dillon, supra,* this provision of the Florida constitution must be borne in mind, and a reason can be readily perceived for the holding of the Florida court that municipal elections are not elections under the constitution, but, as that case holds, are expressly exempted therefrom. In *Buckner* v. *Gordon, supra,* the holding of the Kentucky court is based upon the fact that "long prior to and ever since the adop-

264 — 24

tion of the constitution it has been the legislative rule, rather than the exception, to fix in the charters of towns and cities a qualification for electors different from that prescribed in the constitution for State, county and district electors," and the court holds that "the fact that such governments were at the time of the adoption of the constitution, and have ever since been, controlled by the legislature, taken in connection with the sixth section of the sixth article, clearly shows the intention of the framers of the constitution to leave all these matters to the legislative will." It will thus be seen that the two cases last mentioned can not be relied upon in support of the holding of the majority, but, on the contrary, are in accord with the construction that I have placed upon the *English* and *Yost cases.* I concede that *Hanna* v. *Young, supra,* is clearly against my view and I make no attempt to distinguish it, but merely content myself with saying that I disagree with the view therein expressed.

A pioneer case on the question whether the legislature has the power to prescribe different qualifications for voters for statutory offices than is prescribed in the constitution for electors is *People* v. *Canady,* 73 N. C. 198, decided in 1875. The constitution of North Carolina prescribed, among other qualifications, that to be an elector one must reside in the county thirty days. The legislature attempted to prescribe, as one of the qualifications for a voter for statutory city offices, that he must have resided ninety days in the lot, block and ward in which he resides at the time of applying for registration. In passing on the validity of this statute the court said: "The constitution provides that every male person twenty-one years old, resident in the State twelve months and in the county thirty days, shall be an elector. (Art. 6, sec. 1.) An elector for what? The constitution does not say for what. Does it mean elector for president, or for members of Congress, or for Governors, or for judges, or for members of the General As-

sembly, or for county officers, or for township or town officers, or for what else? There it stands by itself, without explanation: that every such person shall be an elector—a voter. It evidently means to designate those persons as a *class*, to vote generally whenever the polls are opened and elections held for anything connected with the general government or the State or local governments,— just as a class of persons are designated as qualified for jurors. * * * But cities and towns, like counties and townships, are parts and parcels of the State, organized for the convenience of local self-government, and the qualifications of their voters are the same. It follows that the General Assembly cannot in any way change the qualifications of voters in State, county, township, city or town elections."

The majority opinion notes that under the doctrine of contemporaneous, long continued and uniform legislative construction, the courts of New York, Michigan and Oregon have recognized the right of the legislature to fix different qualifications for district school officers from those prescribed by the constitution for electors in other cases, and states that this doctrine has no application in Illinois. I have attempted to point out wherein it does have an application in this State. Whether or not it may be properly said to have such an application, the courts of New York, Michigan, Oregon and Ohio have experienced no difficulty in construing the *English* and *Yost cases* in harmony with the true intent and meaning of our own constitution. It would seem that this court should have no great difficulty in construing the *English* and *Yost cases* as the courts of other States have construed them, and especially should this be true when we consider the fact that by so construing these cases the integrity of our constitution can be preserved.

The majority opinion makes no defense of the *English* and *Yost cases* as having been properly decided as it construes them. If, by placing the construction on those cases

which has been placed upon them by the majority, violence will be done to our constitution, this court should not hesitate to adopt the construction which has been universally placed upon these cases by courts of other jurisdictions. It is pointed out that the *English case* and the *Yost case* have been followed in a number of other cases by this court. While this is true, the basis of the holdings of the *English* and *Yost cases* has never been questioned or explained in any of the later cases. The later cases are therefore of no assistance in determining this question and are of no weight as authority. The most casual reading of the *Yost case* should be convincing that the court did not consider the question here involved but that the theory of the Michigan case controlled the conclusion there reached. It is highly improbable that the court there meant to hold as the majority finds it did, without any discussion of the many important points involved. An opinion making a holding of such importance and fraught with such consequences should certainly state the basis of its conclusions with such clearness that it would leave no doubt in the mind of the reader. This the court evidently failed to do, and we should now place that construction upon the *Yost case* which is in harmony with the plain language of the constitution.

In my opinion the legislature is without power to prescribe any different qualifications for electors for political offices than those prescribed by the constitution. If it is desired by the people of the State to prescribe different qualifications for electors and to extend the right of suffrage it must be done by way of an amendment to the constitution.

In my opinion the legislature clearly exceeded its authority in the passage of the act in question, and the decree of the superior court should be reversed.

Mr. JUSTICE CRAIG, dissenting:

As a republican form of government is based upon the right of suffrage it is essential that the exercise of that right be fixed by the fundamental law, which in this State

is the constitution. When the constitution has determined who shall exercise the elective franchise there is no power to change it except the people themselves by the adoption of a new constitution or amending the old one. This proposition is fully supported by the authorities on constitutional law, (Cooley on Const. Lim.—7th ed.—58; Black on Const. Law, 649;) and it seems to me to be self-evident, for the reason that the only way in which a government by the people can exist is that at stated elections the power to change the laws and officers of government shall return to the people. If the legislative branch of the government can change the qualifications of the electors who vote for a large and important number of officers, even though the offices held by such officers are created by legislative authority, by enlarging or restricting the class of those who are declared to be voters by the constitution, it amounts to depriving the people of the power they have expressly reserved to themselves.

The decisions in the cases of *People* v. *English* and *Plummer* v. *Yost,* cited in the opinion of the majority of the court, are based largely, if not solely, upon the fact that the subject of education was made a matter of special constitutional regulation, and its officers, therefore, with the exception of those mentioned in the constitution, might be considered an exception to those included within the constitutional provision prescribing the qualifications of electors. While the court did not so hold in *People* v. *English, supra,* it intimated that such might be the case. In the subsequent case of *Plummer* v. *Yost, supra,* the court adopted the suggestion made in *People* v. *English* and held that such a distinction did exist. But in neither of the above cases did the court hold that as to any other officers than school officers such a distinction might be made. In neither of these cases did the court lay down the broad rule that as to statutory officers, or offices of statutory creation, the will of the legislature was supreme and it could prescribe and fix such

qualifications for electors as it saw fit. As I read those cases it was not intended to so hold. In each case the court pointed out particularly that what was said was said with reference to minor school officers in school elections, and the language used would indicate that it was intended not to apply to other officers or other elections. My views in this respect are also sustained by the decision in the subsequent case of *Sanner* v. *Patton,* 155 Ill. 553, a contested election for the office of highway commissioner,—a statutory officer,—in which the court, in defining the extent of the power of the legislature to restrict the right of suffrage, among other things said: "Under section 1, article 7, of our constitution every male citizen of the United States above the age of twenty-one years, who has resided in the State one year, in the county ninety days and in the election district thirty days next preceding any election, is entitled to vote at such election. To exercise this right there is one exception, and but one, so far as we have been able to find, and that is found in section 7 of the same article, which declares that the General Assembly shall pass laws excluding from the right of suffrage persons convicted of infamous crimes. Adopting the well known maxim or rule of construction that the expression of one thing is to be regarded as the exclusion of another, the legislature does not possess the power to take away from a resident citizen the right of suffrage unless he has been convicted of an infamous crime."

The only instance to which my attention has been called where any exception has been made in the qualifications of electors as prescribed by the constitution is in school elections for minor officers. But the matter of education was the subject of special constitutional regulation, and school officers are not classed as municipal officers. As to the nature of these officers, this court, in *People* v. *Trustees of Schools,* 78 Ill. 136, said: "These school townships were created and are continued for school purposes alone, and

not for municipal purposes. They are only intended to establish schools, and loan and manage the school fund of the township, and pay the teachers of schools taught in their jurisdiction. This is the purpose of their organization. They were not created to exercise any of the functions of government and hence are not municipal in their nature or purpose, nor are they provided with the officers or the power to exercise the functions of government." To the same effect is *People* v. *Board of Education,* 255 Ill. 568, where *People* v. *Trustees of Schools, supra,* is cited with approval and the same rule announced.

That there is, in fact, no distinction between the qualifications of electors for constitutional and statutory officers is clear from the recent holdings of this court in the long line of cases known as the "Primary Election Law cases." In 1905, 1906 and 1908 the legislature passed what are known as the Primary Election laws. These elections were of purely statutory origin, and the election laws embraced within their provisions not only constitutional officers and the statutory officers included in section 1 of the act under consideration, but also all of the various officers created by it for perfecting and carrying on the party organization. These laws were each in turn declared unconstitutional and void in their entirety. In passing upon their constitutionality no attempt was made to distinguish the difference between the legislature's power over statutory and constitutional officers or to distinguish between the valid and invalid portions of those laws, as should have been done under the holding of this court in the present case and *City of Chicago* v. *Wolf,* 221 Ill. 130, cited in the majority opinion, had there been any difference in that respect, but each act, and as to all officers therein mentioned, was declared unconstitutional and void in its entirety. In passing upon the constitutionality of the act of 1905, this court, in *People* v. *Board of Election Comrs.* 221 Ill. 9, said: "It is undoubtedly true that at the time the constitution was

adopted, primary elections, as such, were not within the contemplation of the convention or the people, for the reason that up to that time they had not been made part of the election system or subject to regulation by law. At that time candidates for office were nominated by means of the caucus and convention of delegates, and such nominations were purely private affairs of the political organizations. Since that time there has been a considerable extension of the election system. The election laws had already been extended by providing for registration in advance of the election, so that all electors might know beforehand who claimed the right to vote and to make necessary investigations to determine whether the right existed. * * * All these acts relate to the same subject, and in combination are designed to constitute a single and harmonious system under which the people may exercise the elective franchise and make their choice between the candidates for public offices. They all relate to elections and are within the meaning of that word as used in the constitution. It seems clear that the elections protected by the constitution are all such elections as are held under authority of law, at which qualified electors may vote; and when statutes are enacted which regulate the form of the ballot to be used, what shall appear upon the ballot and how the candidates whose names shall so appear shall be chosen, the provision of the bill of rights applies to the new condition." *People* v. *Board of Election Comrs. supra,* is cited with approval in *Rouse* v. *Thompson,* 228 Ill. 522, and *People* v. *Strassheim,* 240 id. 279, in neither of which is any distinction made in the application of the provisions of the bill of rights and the provisions of section 1 of article 7 of the constitution to all elections held under authority of law, no matter what the character of the election or the nature of the officer to be elected thereat. Both provisions of the constitution were held alike applicable to all elections held under the authority of law. Thus, in *People* v. *Strassheim, supra,* in

passing upon the constitutionality of the act of 1908, this
court, after quoting the provisions of section 1 of article 7,
said: "This court has held that a law providing for the
nomination of candidates for public office by a primary elec-
tion is an election law and that all primaries held under
it are elections within the meaning of the constitution, and
that such a law, to be valid, must sustain the constitutional
rights of voters and not curtail, subvert or injuriously re-
strict such rights." If the rule announced in these decisions
is still the law they are decisive of this question. It is
contradictory to say that the provisions of the constitution
apply to primary elections and all officers to be nominated
thereat,—a species of elections provided by the legislature
and not even within the contemplation of the framers of
the constitution or the people at the time the constitution
was adopted,—(*People* v. *Board of Election Comrs. supra,*)
and do not apply to the elections for such officers after
they are nominated.

In my judgment this court, in *People* v. *Board of Elec-
tion Comrs., Rouse* v. *Thompson* and *People* v. *Strassheim,
supra,* correctly applied the law in this State to the matter
then under consideration. Those decisions are in perfect
harmony with the universally understood and accepted in-
terpretation of section 1 of article 7 of our constitution.
The words "any election therein,"—meaning the voting
district or precinct,—are as broad and comprehensive as
any that could have been used for that purpose, the word
"any" being equally as comprehensive as the word "all"
and synonymous with it. (2 Am. & Eng. Ency. of Law,—
2d ed.—414; 2 Cyc. 472; *People* v. *Purdy,* 4 Hill, 384;
*People* v. *VanCleave,* 187 Ill. 125; *Johnson* v. *Grant Fork
County,* 16 N. D. 253; *Leonard* v. *Commissioners,* 112 Pa.
622; *State* v. *Hany,* 95 Iowa, 413; *West Chicago Park
Comrs.* v. *McMullen,* 134 Ill. 170.) In the American and
English Encyclopedia of Law, *supra,* it is said: "The word
'any' is frequently used in the sense of 'all,' and when thus

used it has a very comprehensive meaning;" and in 2 Cyc. *supra,* it is said: "The word 'any' may mean 'all,' 'each' or 'every.'" The same definition of the word is adopted and approved in *People* v. *VanCleave, supra,* where it is said: "Bouvier, in his Law Dictionary, says that the word 'any' is given the full force of 'every' or 'all.'—*Logan* v. *Small,* 43 Mo. 254; *McMurray* v. *Brown,* 91 U. S. 257; *Davidson* v. *Dallas,* 8 Cal. 227; *Overseers of Manchester* v. *Guardians of St. Pancras,* 4 Q. B. Div. 409; *County of Chicot* v. *Lewis,* 103 U. S. 164." In *People* v. *Purdy, supra,* the words "any body politic or corporate," used in the constitution of New York, were held broad enough to include public corporations. It was there said: "These words are as broad in their signification as any which could have been selected for the occasion from our vocabulary, and there is not a syllable in the whole instrument tending in the slightest degree to limit or qualify the universality of the language. If the clause can be so construed that it shall not extend alike to *all* corporations, whether public or private, it may then, I think, be set down as an established fact that the English language is too poor for the framing of fundamental laws which shall limit the powers of the legislative branch of the government." The cases of *People* v. *Morgan, People* v. *Kipley, People* v. *Loeffler* and *People* v. *Olson,* cited in the majority opinion, do not announce a contrary doctrine. The case of *People* v. *Bowman,* also therein cited, has reference to officers in drainage districts, which are *quasi* municipal corporations and their officers are not municipal or political officers. (28 Cyc. 128-130.) In none of the other cases did the court hold that the legislature had the power to prescribe any different qualifications for electors for statutory officers than those fixed and prescribed by the constitution. All that they hold is that the power to create an office carries with it, as an incident to such power, the right to determine the manner in which the office shall be filled,—that is, whether by appointment or by

election by the people,—the length of the term of office, the compensation to be paid such officers, and to abolish such office altogether. But they do not hold that when the legislature determines that the office shall be filled by an election of the people it has the power to provide that it may be done by the votes of any other persons than those possessing the qualifications of constitutional electors. They are therefore in no way controlling in this case.

No reason has been given for the distinction between the qualifications of electors for the constitutional offices and the statutory offices. Many of the statutory offices are of equal or greater importance than the constitutional offices to be filled by votes of the electors. The only true rule, and the only rule which will avoid great confusion and embarrassment in the future, is to adopt the literal wording of section 1 of article 7 of the constitution and apply it in its true sense to all elections for all offices, whether constitutional or statutory.

I have thus far dealt with the question as one solely of constitutional construction. So viewing it, the proper construction of the section can no longer be considered either an open or debatable one when the well settled rules of constitutional construction are adhered to and applied. The right to vote and to be voted for as a candidate for office are purely political rights, (*Fletcher* v. *Tuthill,* 151 Ill. 41,) and in this case a court of chancery would have no jurisdiction were it not for the fact that the bill charges that the providing of additional ballots, ballot-boxes, etc., made necessary by the act of June 26, 1913, under consideration, will require additional expenditures of taxes and revenues for that purpose. *Fletcher* v. *Tuthill, supra.*

· As the questions in this case involve political rights, it is important to note that for many years, and ever since the adoption of the first constitution, in 1818, the legislature, the courts and all other departments of the State government have recognized and accepted the constitution as

declaratory of the sole qualifications of electors for all elections for all offices in this State. (*Spragins v. Houghton,* 2 Scam. 377.) This contemporaneous exposition by the legislature and the courts, universally sanctioned and acquiesced in by the people and all departments of the State government for nearly a century, is so strong an endorsement of its correctness that the proper construction ought now to be considered as settled. (*Spragins* v. *Houghton, supra; People* v. *Supervisors,* 100 Ill. 495; *Nye* v. *Foreman,* 215 id. 285; *Boehm* v. *Hertz,* 182 id. 154.) When the section is construed as it has been heretofore universally understood and interpreted by the legislature, the courts and the people of the State generally for nearly a century, there can be no question but that the act is contrary to our fundamental principles of government, that it transcends the legislature's power, and is therefore unconstitutional and void. In my judgment it should be so held by this court and the decree of the superior court be reversed.