Jones, J.,
dissenting. Section 1 of Article V of the State Constitution of 1851 is as follows: “Every * * * male citizen of the United States, of the age of twenty-one years, who shall have been a resident of the state one year next preceding the election, and of the county, township, or ward, in *186 which he resides, such time as may be provided by law, shall have the qualifications of an elector, and be entitled to vote at all elections.”
The term “all elections” is now construed by this court to mean only those elections of constitutional origin or cognizance, and is so construed as not to include municipal elections. This section is simple, plain and explicit. It does not say “at all elections provided for by the constitution” or “at all elections except municipal elections.” It does not say “at some elections,” but “at all elections,” which includes municipal, a signification applied by legislative and popular policy in this state for nearly a century. This is the only article of the constitution that relates exclusively to the elective franchise, and in no other part of that organic law can there be found a single syllable which attempts to define the ■ qualifications of electors for the state and its political subdivisions. Until recently I have never heard the claim advanced, by layman, lawyer or jurist, that this section of the constitution did not embrace municipal elections. By the terms of this section the male sex obtained, via the constitution, the right to vote at municipal elections, and neither legislative policy nor enactment can deny them this constitutional right; although if the majority opinion be followed the legislature of the state may confine the elective municipal franchise solely to women, or to others, as it may choose. When the Constitution of 1851 was framed the members of the constitutional- convention knew that cities were organized and elections held therein, as held in townships, counties and state, *187 and they employed this composite term, “all elections,” as comprehending each and every political election held in the state and its political subdivisions. They recognized municipalities as “things already in being.” See last proposition of syllabus, Cass v. Dillon, 2 Ohio St., 608.
The president of the Ohio Woman’s Suffrage Association simply reflected the view of the body politic, when, upon learning of the decision of this court, she gave the following interview to the press: “I had no idea when our suffrage movement was defeated in 1912 and the .home-rule amendment passed, that it might prove a valuable ally and secure municipal suffrage for us. Neither did forces that supported home rule have any such idea, I am sure.”
As applicable to the popular construction involved, and especially germane to this case, is the language of the judge delivering the opinion in Platt, a Taxpayer, v. Craig et al., 66 Ohio St., 75, 77: “The constitution must be construed in the light of the popular and received signification of its words. Because it emanates from the people it must be construed as the people must have understood it.”
When the constitutional convention of 1912 adjourned it submitted a constitutional amendment to the people granting to women the elective franchise “at all elections.” This was defeated by a majority of 87,455. Another proposal granting female suffrage by constitutional amendment was submitted in 1914, which if adopted would have granted women the right to vote at all elections. *188 The proposition was again defeated, by a majority of 182,905. Can it be otherwise surmised than that the women of the state would have been endowed with full suffrage at all elections, including municipal, if either of these proposals had passed ? In the constitutional convention of 1912, proposals embodying woman suffrage and home rule ran along side by side, were discussed from every viewpoint and angle, and in the debates that ensued not a line espousing the right of the female sex to vote at municipal elections can be found in the report of convention proceedings., And in the election following, to adopt or reject the proposed amendments, neither on the hustings nor in the public press do I recall a single instance of the advocacy of this strange constitutional birth, which is now legitimatized by judicial mandate.
The decision in this case does violence to the plain terms of the constitution. The province of the court is to interpret, where interpretation is required. It cannot arrogate to itself the right to make a constitution. It must enforce the terms of the constitution irrespective of underlying public policy. As stated in The State, ex rel., v. Board of Elections, 80 Ohio St., 471, 491: “The question here is, whether a provision, whose meaning is certain, shall be enforced. It cannot be necessary to repeat the reasons which have led this court to give an affirmative answer to that question. * * * According to the view entertained by all constitutional lawyers, constitutions may not be amended by violence.”
And as conforming to the intention of the makers *189 of the constitution, and of the .people who adopted it, the language of Judge Ranney in Hill v. Higdon, 5 Ohio St., 243, 248, is peculiarly apt: “It is our duty to give a construction to the constitution as will make it consistent with itself, and will harmonize and give effect to all its various provisions. To do this, we have only to suppose that the convention used language with reference to its popular and received signification.; and applied it as it had been practically applied for a long series of years.” In this connection it may be stated that the Constitution of 1802 had substantially the same sex qualifications as has the Constitution of 1851, both granting the male sex the qualifications of an elector “in all elections;” and this phrase received, at least so far as political elections were concerned, the sanction of popular thought and judicial decision as applicable to municipal as well as to county, township and state elections.
The rule of construction is also well stated in Wilcox v. Nolze, 34 Ohio St., 520, 523: “The rule applicable to constitutions, as well as statutes, which may be properly invoked in this case, is that, where the language is clear, there is no room for construction; and the spirit of a provision must be extracted from its words, and not from conjectures aliunde.”
Is it a reasonable construction that the members of the constitutional convention conceived or entertained the purpose of granting by legislation or municipal charter special privileges to women in the municipalities of the state while denying them to the women of the rural communities? The lat *190 ter are just as much interested in governmental problems and in fiscal affairs as are their sisters dwelling in the cities. Yet in no possible event, under the strained construction given Section 1, Article V, can the women of hamlets and townships outside of municipalities ever hope to vote for trustees and other fiscal officers in townships, without amendment of the constitution, while those of their sex fortuitously dwelling in municipalities may vote for their fiscal municipal officers without such amendment. Whether decided correctly or not, the case of State, ex rel. Mills, v. Board of Elections et al., post, 194, granting women the right to vote for school officers, had the merit at least of placing the women of town and country on an equal plane and with equal suffrage throughout the entire state.
Under the construction here adopted, a municipality by charter, or the general assembly by law, may provide any qualifications for its electorate in municipal elections. Chartered cities may prescribe distinct and various qualifications without any semblance of uniformity. They or the legislature may nullify the constitutional requirements with respect to age and residence found in the section involved.
It is the uniform and fundamental principle of law that in the construction or interpretation of a constitution recourse may be had to the proceedings of the constitutional convention. On February 8, 1851, while the article on the elective franchise was before that body, Mr. Taylor, a member of that convention, offered the following as an addi *191 tional section to the elective article: “Section 7. The General Assembly shall have power to extend the right of suffrage to inhabitants of this State not hereby qualified as electors.” (2 Debates, page 555.) It will be observed that this was not offered as a substitute for Section 1, Article V, but to supplement that section by giving to others not included therein the right of suffrage by legislative action. Had Section 7 been adopted, while the qualifications of the male sex would still have remained intact under Section 1 aforesaid, it would have permitted the general assembly to extend the right of suffrage to women in municipalities. The fact that this supplemental section was defeated by a vote of 11 yeas to 68 nays indisputably evinces the intention of the convention to commit the question of the entire elective franchise to the male sex, and to deny legislative interference by any extension thereof.
Prior to the adoption of the home-rule section our courts had uniformly and consistently denied women the right to hold any appointive or elective public office, whether that office were of constitutional origin or not. This is evinced by the decision of this court that a woman cannot hold the office of notary public, although this office is not a constitutional office but purely one of legislative creation. (Section 119 et seq., General Code, and State, ex rel. Atty. Genl., v. Adams, post, 196.) The holding of this court that the Elective Franchise Article of the Constitution comprehends offices and elections of constitutional origin or cognizance and does not embrace municipal elec *192 tions is largely based upon the case of Scown v. Czarnecki, 264 Ill., 305, where, by a divided court, that state held that under the provisions of its constitution the legislature 'had authority to provide for municipal suffrage. The opinion of the majority in that case is not convincing, but the separate opinions of the three dissenting judges are buttressed by convincing reason and judicial logic. The Scown case is against the overwhelming weight of authority of the decided cases relating to the right of female suffrage under constitutions similar to our own: Coffin et al. v. Election Commissioners, 97 Mich., 188; Goggeshall et al. v. City of Des Moines, 138 Ia., 730, 736; Gougar v. Timberlake, 148 Ind., 38; Allison v. Blake, 57 N. J. Law, 6; In re Inspectors of Election, 25 N. Y. Supp., 1063; Minor v. Happersett, 21 Wall., 162, and Spencer v. Board of Registration, 1 MacArthur (D. C.), 169. The foregoing cases clearly establish the judicial principle that under such language as employed in our constitution, the constitution has taken entire and complete control of electoral qualifications, and that any attempt to limit or add to those qualifications is nugatory. In three of the foregoing cases an attempt was made by the legislature to confer limited suffrage upon women in local or municipal affairs.
The principle announced in the majority opinion herein, to the effect that the constitutional requirements relating to electoral qualifications in Section 1, Article V, do not apply to offices unknown to the constitution, has been repudiated many times by the decisions of the supreme court of this state. *193 As heretofore stated the case of State, ex rel. Atty. Genl., v. Adams, post, 196, held that Section 1 of Article V of the Constitution rendered a woman ineligible to the office of notary public, an office purely legislative in character.
In the case of The State, ex rel. Armstrong, v. Holliday, Auditor, 61 Ohio St., 171, the supreme court held that the office of county warden, which is not recognized by the constitution, could not be created by legislative act providing for his appointment.
In the case of The State, ex rel. Attorney General, v. Wilson, 29 Ohio St., 347, our court of'last resort held that the office of medical superintendent, which is likewise unknown to the constitution, was subject to the provision of Section 4, Article XV thereof, requiring such office to be filled by an elector of the state.
In the case of The State, ex rel. Attorney General, v. Kennon et al., 7 Ohio St., 547, this court held that the legislature had no jurisdiction to appoint statehouse commissioners, positions likewise unknown to the constitution, and that a legislative appointment of such officers was violative of-Section 27, Article II of the Constitution.
The effect of all these decisions is, that though the offices may be purely the creature of legislative enactment, the cloak of the constitution covers them as well as those appointive or elective which are of constitutional origin.
In the case of The State, ex rel., v. Constantine, 42 Ohio St., 437, the supreme court applied the *194 constitutional limitation to city officials, offices likewise unknown to the constitution. That was a proceeding to oust the defendants from the office of police commissioners, of the city of Springfield. This was purely a municipal office. The ouster was decreed because of the violation of Section 27, Article II of the Constitution, providing for the election and appointment of all officers. This decree was made effective as against the officers of a municipality, and it followed, of course, that the term “all officers” used in that section included municipal as well as constitutional officers.
The majority opinion finds comfort in the case of State, ex rel. Mills, v. The Board of Elections et al., 9 C. C., 134, Judge Shauck delivering the opinion. That case was affirmed by an evenly divided court, and without opinion, in 54 Ohio St., 631. Judge Shauck, who had delivered the opinion on the circuit, having in the meanwhile been elected to the supreme bench, voted for affirmance. Minshall, C. J., Bradbury and Burket were marked as dissenting. The case upheld the power of the general assembly to confer upon women the right to vote for school officers. It is now said that this unreported case sustains the principle that the constitutional provision relating to sex qualifications does not apply to municipal officers. Whether the case was rightfully decided or not I am for sustaining the principle therein announced under the doctrine of stare decisis, and I would claim the same privilege from the majority of likewise upholding the same doctrine if it is demonstrated that this court in the past has uniformly refused to *195 apply Section 1, Article V, solely to elections and offices of constitutional cognizance. The decision in the Mills case, supra, was based squarely upon the fact that the special and express provisions of the constitution relating to public schools govern, and the act there involved was held constitutional for that reason only. The learned judge in that case said that the rule that the general assembly might provide electoral qualifications for offices unknown to the constitution was followed in some jurisdictions, but did not obtain everywhere, and especially it did not obtain in Ohio. On page 138 it is said: “It must be admitted that the rule that persons not having the constitutional qualifications of electors may be authorized to vote at any election that is not held to fill an office created by the constitution does not obtain everywhere. In view of State ex rel. v. Constantine, it cannot be said to obtain in this jurisdiction The Constantine case cited by him, and noted above, relates entirely to purely municipal officers, and it would therefore appear that by discarding the rule claimed then and now, the court on the circuit stated that the feature of the office, whether constitutional or otherwise, did not govern its action, but that it was based entirely upon distinct and special provisions in our constitution relating to public schools. This position is clarified by the succeeding sentence of the judge in the paragraph named, where he states that the ample powers for the establishment and maintenance of public schools, conferred by the legislatures of the various states, carry with them power to extend the right to vote for school officers to *196 persons not within the constitutional definition of electors, “unless such officers are designated by the constitution, or are officers of municipal or political divisions recognized by the constitutionBy the use of that language it clearly appears to be the view of the court that the legislature had no power to extend the vote either for officers designated by the constitution, or for officers of municipal and political divisions recognized by the constitution.
This is indubitably shown by the further fact that the circuit court in the Mills case relied upon two differentiated cases reported by the supreme court of Michigan, under a constitution similar to our own, and which grants to the male sex the right to vote “in all elections " These cases are Belles v. Burr et al., 76 Mich., 1, and Coffin et al. v. Election Commissioners, 97 Mich., 188. Under this similar provision of the Michigan constitution the court held in the former case that the legislature of Michigan had authority to confer upon women the right to vote for school officers; but, in the second case, when the legislature of the state, later, in 1893, attempted to confer upon women the right to vote for village and city officers, the legislative act was declared unconstitutional.
If there be any doubt as to the attitude of our court upon this subject it has been definitely and conclusively settled by the case of State, ex rel. Attorney General, v. Adams, 58 Ohio St., 612. This case involved the question of whether Miss Adams could be commissioned as a notary public of Lake county, and it will be observed that the office in question was neither of constitutional origin nor *197 cognizance. The legislature had passed an act which had authorized the governor to make the appointment, 93 Ohio Laws, 405. The court held that the legislative effort was ineffectual to render her eligible to the office of notary public in view of the provisions of Section 4 of Article XV, and Section 1 of Article V of the Constitution. The opinion was by the court and appears to be unanimous. The court referring to the Mills case, reported in 9 C. C, supra, and to a former case decided by this court, both relating to the subject of schools, said, at page 616: “It was held in those cases that the qualifications of an elector are not essential to the holding of positions of an official character under the school laws, because of the effect of the constitutional provisions relating especially to the subject of schools. Those cases have not sufficient breadth or strength of foundation to admit of additional superstructure.”
The phrase “and all elections” has been incorporated in another part of the Ohio constitution. A constitutional amendment was adopted in 1905 providing for biennial elections. This amendment, Section 1, Article XVII, after providing that state and county officers shall be elected in the even numbered years, then proceeds as follows, “and all elections for all other elective officers shall be held on the first Tuesday after the first Monday in November in the odd numbered years.” Can it be argued that this section of the constitution is ineffective and does not cover municipal as well as township elections ? Under its provisions undoubtedly the legislature has no authority to prescribe *198 by law, nor a municipality by its charter, for a municipal election to be held any other time than that mentioned in the constitution. The phrase “all elections for all other elective officers” undoubtedly includes municipal as well as township officers, and their election must be held in the odd numbered years as provided for therein. This is the view taken in the opinion of the court in Holbrock v. Smedley, 79 Ohio St., 391, wherein it is said, at page 398: “By the constitutional amendment, (Article XVII, adopted in 1905) providing for biennial elections, municipal elections are now required to be held in November and in the odd numbered years.”
Let us assume that the city of East Cleveland under its claimed prerogative should attempt to hold a municipal election by the use of voting machines, could such a prerogative be maintained in view of Section 2 of the Elective' Franchise Article, which provides that “all elections” shall be by ballot? The case of The State, ex rel., v. Board of Elections, 80 Ohio St., 471, decided that an act authorizing the use of such voting machines in the city of Cleveland was void because it was repugnant to the foregoing section, which provided that “all elections shall be by ballot.”
Section 6 of the Elective Franchise Article provides that no idiot or insane person shall be entitled to the privileges of an elector. .This certainly applies to municipal as well as other elections, and neither city or legislature can qualify that section by any law limiting its purport. There seems to be no reason why the constitutional requirement *199 that males only shall be entitled to vote at all elections should apply to offices known to the constitution any more than to those of municipalities organized by the state.
Article XVIII, Section 1, provides for the classification of cities and villages. Article XVII, Section 1, provides for the election of all other elective officers than state and county in odd numbered years. And Section 3 of the same article provides that every elective officer holding office when this amendment, is adopted shall continue to hold such office for the full term for which he was elected, and until his successor shall be elected and qualified as provided by law. Article XVII, Section 2, provides for the terms of state,' judicial, and elective county, township and municipal officers. Article XVIII, Section 13, provides for a limitation of municipal indebtedness. Article XV, Section 7, provides that every person chosen or appointed “to any office” under this state shall take the oath of office before entering upon the discharge of its duties. Section 10 of the same article provides that appointments and promotions in the civil service of the state, counties and cities shall be made according to merit and fitness; and Section 7 of the Elective Franchise Article provides that all nominations for elective state, district, county or municipal officers 'shall be made at direct primary elections or by petition as provided by law.
These various sections have been cited in order to show the consideration given by the Ohio Constitution to the organization, government and control of its municipalities and municipal officers. *200 Far more regard and control is shown by these constitutional provisions to the municipalities of the state than is shown to its other political subdivisions, such as counties and townships. Such being the case does it not follow that, by the adoption of all these provisions of the constitution, our organic law had as much- regard for the subject of electoral qualifications of those in cities as for those who dwelt without ? If construction were necessary for the phrase under controversy the legal maxim expressio unius est exclusio alterius is peculiarly applicable. That is, Section 1, Article V, having designated the qualifications of electors, it thereby determined who should exercise the franchise, and necessarily excluded all others. As stated by that great constitutional lawyer and judge, “Wherever the constitution has prescribed the qualifications of electors, they cannot be changed or added to by the legislature, or otherwise than by an amendment of the constitution.” Cooley’s Constitutional Limitations (7 ed.), 902.
It is stated in the syllabus of the case of McCafferty v. Guyer et al., 59 Pa. St., 109:
“2. The legislature cannot confer the right to vote upon any classes but those to whom it is given by the constitution; the description of those entitled excludes all others.
“3. The 3d article of the constitution is not merely a general provision defining the indispensable requisites to the rights of an elector, leaving the legislature to determine who may be excluded. It is a description of who shall not be excluded.”
*201 In the preparation of the Constitution of 1851, when Section 1, Article V, was proposed, surely such eminent jurists as Ranney, Swan and Hitchcock (members of that convention and later distinguished members of this court) had no thought that they were framing an elective article, the effect of which, under the construction now made, would be to apply the electoral franchise under the term “all elections” only to those offices known to the constitution, and not to municipal offices; and that the general assembly might thereafter provide female electoral qualifications for the office of township constable, an officer not recognized in the constitution, but be without legislative power to grant women the right to vote for township trustees, which officers are so recognized; nor had they a thought that the legislature would have power to provide for female suffrage for the office of coroner, which is unknown to the constitution, but would have no authority to grant women the right to vote for clerk of courts and sheriff, county offices which are recognized by that organic law.
Article XVIII, adopted September 3, 1912, provides that municipalities shall exercise “all powers of local self-government.” It will not be permitted to allow the dubious character of this grant to strike down another and express provision of the constitution dealing solely with the elective franchise, and which is the only article of that instrument which attempts to deal with the subject of the elective franchise. The position now taken by this court is—that as municipal elections and the qualifications of electors therefor were within the *202 legislative powers, a municipality had like and equal power by its charter, to fix the qualifications of electors for municipal officers. The right of suffrage is a sovereign right. It is one of the attributes of sovereignty, and in this state it has been so recognized by confiding the entire subject of the elective franchise to Article V of our Constitution, limiting that right in political elections to the male sex solely. A municipal charter may now in many respects ignore a state law, but it cannot nullify the state constitution.
However, there is still another insuperable reason against the position taken by the majority of this court, which, in my opinion, absolutely destroys the fallacy on which it is based. This is found in Section 4, Article XV, of the Ohio Constitution, amended at the recent election occurring in November, 1913. So far as this relates to the' electoral qualifications this section is a companion section to Section 1, Article V, now in controversy. Prior to the election of 1913, it read as follows: “Section 4. No person shall be elected or appointed to any office in this state, unless he possess the qualifications of an elector.” At that election, however, the people of this state amended this section to read as follows: “Section 4. No person shall be elected or appointed to any office in this state unless possessed of the qualifications of an elector; provided that women who are citizens may be appointed as members of boards of, or to positions in, those departments and institutions established by the state or any political subdivision thereof involving the interests or care of women or *203 children or both.” (103 O. L., 992.) And since this provision is a later pronouncement by the people than the provisions of the home-rule amendment, adopted in 1912, due regard should be given to its effect because of that fact.
The provisions of the East Cleveland charter, in granting to the female sex the right to vote for municipal elective officers, also provide that they shall be eligible for appointment or election to any municipal office therein. By this adoption the charter flew in the teeth of the 1913 amendment and is in flagrant defiance thereof. This recent amendment provides generally that women cannot be elected to any office in this state, unless possessed of the qualifications of an elector. To ascertain what such qualifications are recourse must be had of course to Section 1, Article V, which attaches them to the male sex alone. It follows that under the new amendment they can not be elected to any office, but may be “appointed” only. And the provision limits the right of women citizens to hold appointive offices to those departments or institutions established by the state or any political subdivision thereof involving the interests or care of women or children. The city of East Cleveland is a political subdivision of the state, and this section of the constitution in effect denies women the right of election but permits them merely to be appointed to positions in the special class of institutions named; and this includes such institutions established by a municipality, which is a political subdivision of the state. This clearly negatives the idea that they may be elected to or hold city offices *204 in the city of- East Cleveland, as proposed by the charter; and I submit that if power to grant elective franchise is conferred by the words “local self-government” in the home-rule section, that this latest act of the people by the constitutional route, adopted by them since the adoption of the home-rule amendment, has effectively destroyed that power if it ever existed. A fortiori, in view of this recent amendment, and without the cloak of the home-rule amendment, it is impossible to sustain any construction that endows the legislature with authority to confer upon women the qualifications of an elector, or which empowers them to hold office in any institutions other than those specifically mentioned in this recent amendment. The fatuous position a woman would occupy as mayor of East Cleveland is disclosed in the closing paragraph of the majority opinion—a woman shorn of official functions—a queen with a tarnished crown!
The duty of the court here is to uphold and maintain the plain and explicit terms of the constitution. It is not a question of public policy, nor a question whether the action of the people by its adoption in the manner stated was wise or unwise. Under the trend of modern events, and having in view the commanding position that the female sex is taking in the current affairs of the nation, the electorate of this great state may determine the unwisdom of the Constitutions of 1802 and 1851 in denying suffrage to the female sex; but it seems to me that this appeal for the enjoyment of limited or full suffrage should be met by an amendment to the constitution of the state, the source from which it was obtained *205 by the other sex. And when that measure of enjoyment is secured, under the phrase “at all elections” now employed in the present constitution, I shall consistently uphold their right to full suffrage at all elections held in this state, and shall not limit them to the right to vote at a part of them only. I shall give them the full loaf which they have always demanded, and not the half-loaf doled out by the judicial mandate in this case.